1  THOMAS M. HERLIHY (SBN 83615)
   JOHN T. BURNITE (SBN 162223)
2
   WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
3  525 Market Street, 17th Floor
   San Francisco, California 94105-2725
4  Telephone:    (415) 433-0990
   Facsimile:    (415) 434-1370
5
   Attorneys for Defendant,
6  THE NORTHWESTERN MUTUAL                   E-filing
   LIFE INSURANCE COMPANY
7

8              UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA        PVT

10                 (SAN JOSE DIVISION)

11                              CV  08          2956

12  JOSEPH A. CALLAHAN, M.D.,      )  Case No.
                                   )
13            Plaintiff,           )  **NOTICE OF REMOVAL UNDER**
                                   )  **28 U.S.C. §1441(b) (Diversity)**
14     v.                          )
                                   )
15  NORTHWESTERN MUTUAL LIFE       )
    INSURANCE COMPANY, MATTHEW A.  )
16  PEMBERTON, TRICIA HOESLY, SHARON )
    A. HYDE and DOES 1 to 50,      )
17                                 )
             Defendants.           )
18  _____)

19

20

21

22

23

24

25

26

27

28

358151.1

1    TO THE CLERK OF THE ABOVE-ENTITLED COURT:

2    PLEASE TAKE NOTICE that defendant The Northwestern Mutual Life Insurance

3    Company (hereafter, "Northwestern Mutual" or "defendant" as appropriate) hereby removes this

4    action to the United States District Court for the Northern District of California, pursuant to 28

5    U.S.C. sections 1332, 1441 and 1446, on the grounds that: (1) there is complete diversity of

6    citizenship between plaintiff Joseph A. Callahan, M.D. (hereafter, "Callahan" or "plaintiff" as

7    appropriate ), a citizen of the State of California; defendant Northwestern Mutual, a corporation,

8    organized and existing under the laws of the State of Wisconsin, with its principal place of business

9    in Milwaukee, Wisconsin, is a citizen of Wisconsin; defendant Tricia Hoesly, a citizen of

10    Wisconsin; and, defendant Sharon A. Hyde, a citizen of Wisconsin and; (2) the amount in

11    controversy exceeds the jurisdictional minimum of $75,000 set forth in section 1332(a); and (3) the

12    foregoing facts were true at the time the complaint in this matter was filed and remains true as of

13    the date of filing this notice of removal. Furthermore, as more fully set forth below, the citizenship

14    of defendant Matthew A. Pemberton ("Mr. Pemberton") should be disregarded for the purposes of

15    this removal because Mr. Pemberton is a sham defendant.

16    1.    On May 5, 2008, plaintiff filed in the Superior Court of California, in and for the

17    County of Santa Clara, a civil action entitled *Joseph A. Callahan, M.D. v. Northwestern Mutual Life*

18    *Insurance Company, Matthew A. Pemberton, Tricia Hoesly, Sharon A. Hyde and Does 1-50*, Case

19    No. 108CV111847 ("the complaint").

20    2.    The defendant received copies of the summons and complaint on May 14, 2008,

21    through its registered agent, Fobes Financial Group.  A true and complete copy of the complaint is

22    attached hereto as Exhibit 1.  True and correct copies of the summons to the defendant is attached

23    hereto Exhibit 2.  True and correct copies of other papers issued by the Santa Clara Superior Court

    are attached as Exhibit 3.

24
25    3.    The defendant has not been served with, nor has it received, any other pleadings or

26    documents pertaining to this action.  The defendant is informed and believes, and thereon alleges,

27    that other than the pleadings attached to this notice of removal there have been no further pleadings,

    process, or orders filed in this action.

28

358151.1

4.      The defendant has filed this notice of removal within 30 days of receipt by any defendant of a copy of plaintiff's state court complaint. The defendant is informed and believes, and thereon alleges, that as of the date of filing this notice of removal, the additional named defendants, Matthew A. Pemberton, Tricia Hoesly and Sharon A. Hyde, have not been served with the summons and complaint. Thus, no other named defendant is required to join in this notice of removal. 28 U.S.C. § 1446(b).

5.      The citizenship of the fictitiously named defendants identified as Does 1 through 50 should also be disregarded for the purposes of this removal. *Fristos v. Reynolds Metal Co.*, 615 F.2d 1209, 1213 (9th Cir. 1980).

6.      Tricia Hoesly and Sharon A. Hyde are employed and reside in the State of Wisconsin. *See* complaint, Exhibits C and D. As such, they are citizens of Wisconsin. Moreover, they lack sufficient contacts with the State of California for this Court to exercise personal jurisdiction over them.

7.      The citizenship of Mr. Pemberton should be disregarded for the purposes of this removal because he is a sham defendant named only in an effort to destroy diversity. *Farias v. Bexar Cty. Bd. of Trustees,* 925 F.2d 866, 871 (5th Cir. 1991). The following facts establish that Mr. Pemberton is a sham defendant in this action:

(a)      A plaintiff's own determination as to who are parties to an action cannot prevent a defendant from removing the action to the federal court on diversity grounds. *Rose v. A. Bartlett Giamatti, et al.,* 721 F. Supp. 906, 913 (1989). Rather, the joinder of multiple defendants in a single action is permissible only if "there is asserted against them jointly, severally, or in the alternative, any right to relief in respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question or law or fact common to all defendants will arise in the action." Fed. R. Civ. Proc. 20(1) (Deering's 2002). A fraudulent joinder exists when a diverse defendant is joined with a non-diverse defendant as to whom there is no joint, several, or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the non-diverse defendant. *Tapscott v. MS Dealer Serv. Corp.,* 77

1    F.3d 1353, 1360 (1996) (asserting that right of removal cannot be defeated by fraudulent joinder of

2    resident defendant having no real connection with the controversy).

3         (b)    Plaintiff alleges that Pemberton was "representative for Northwestern

4    Mutual." (Complaint 4:18). Pemberton is a sham defendant, and the purported claim for relief

5    alleged against him in the complaint must be dismissed, because an insurance agent cannot be

6    personally liable for acts allegedly done within the course and scope of his agency for a disclosed

7    principal. *Good v. Prudential Insurance Company of America*, 5 F.Supp. 2d 804 (N.D. Cal. 1998);

8    *Gasnik v. State Farm*, 825 F.Supp. 245 (E.D. 1992). (See, Complaint, Exhibit A thereto, at page 5

9    of application)

10        (c)    Without plaintiff's fraudulent joinder of Mr. Pemberton in this action,

11   complete diversity would exist between the plaintiff and all named defendants. Mindful of that fact,

12   plaintiff has coupled his action against this defendant, which on the face of the complaint is based

13   upon the termination of disability benefit payments under policy number D537212 (complaint 2:4),

14   with a meritless claim of promissory estoppel against Mr. Pemberton. Mr. Pemberton was not in a

15   position to deny coverage, as he was simply a "sales representative" for Northwestern Mutual (*See*

16   complaint, 4.) Therefore, Mr. Pemberton cannot be estopped from denying coverage since he did

17   not have the authority to determine plaintiff's coverage, or accept or deny plaintiff's claim for

18   disability benefits.   The only statement made in plaintiff's complaint with respect to Mr. Pemberton

19   is that he "specifically represented to Dr. Callahan that because of his high income and the nature of

20   his high stress practice that it was important to purchase multiple policies[.]" [4]   The alleged

21   statement by Mr. Pemberton has no bearing on the plaintiff's cause of action for promissory

22   estoppel, the only cause of action brought by the plaintiff against Mr. Pemberton; as such, it is clear

23   that Mr. Pemberton was named in the complaint as a sham defendant solely to defeat diversity.

24        8.    This action is a civil action over which this court has original jurisdiction under 28

25   U.S.C. §1332, and is one which may be removed to this Court by the defendant pursuant to the

26   provisions of 28 U.S.C. §1441(b) in that it is a civil action between citizens of different states and

27   the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, as

28   demonstrated by the following:

3

358151.1

1

2

(a)    The defendant is informed and believes, and thereon alleges, that at the time of the filing of this action, and to date, the plaintiff is a citizen of the State of California.

3

4

5

(b)    The defendant Northwestern Mutual, a corporation, is organized and exists under the laws of the State of Wisconsin, with its principal place of business in Milwaukee, Wisconsin. Defendants Tricia Hoesly and Sharon A. Hyde, are citizens of Wisconsin.

6

7

8

9

10

(c)    The defendant is informed and believes that Mr. Pemberton is a citizen of the State of California. However, as explained above, Mr. Pemberton's joinder does not destroy diversity jurisdiction because the citizenship of a non-diverse party may be disregarded by this Court if it determines that the joinder is a sham used to prevent removal. *See Bennett v. Allstate Ins. Co.,*753 F.Supp 299 (N.D. Cal. 1990).

11

12

13

14

15

16

(d)    This Court may, for removal purposes, look to the removal papers for underlying facts establishing the jurisdictional limit. *Gaus v. Miles, Inc.,* 980 F.2d 564, 566 (9th Cir. 1992). A removing defendant need only show by a preponderance of evidence that plaintiff's claim exceeds the jurisdictional minimum. *Sanchez v. Monumental Life Ins. Co.,* 102 F.3d 398, 404 (9th Cir. 1996). This Court's jurisdictional minimum, an amount in controversy in excess of $75,000 is satisfied by the following:

17

18

19

(i)    By filing the complaint in Superior Court as an unlimited case, the plaintiff represents that he is entitled to recover damages in excess of the minimum superior court jurisdictional threshold of $50,000.

20

21

22

23

24

25

(ii)    The plaintiff alleges that the defendant denied temporary disability benefits on June 27, 2007. (Complaint, 3:13-16)  In the complaint, the plaintiff calculates that he is entitled to policy benefits of $7,500 per month. (Complaint, 4: 14)  Therefore, based on the complaint, plaintiff asserts that he is entitled to $7,500 per month, beginning in June 27, 2007 to the present. As such, plaintiff's breach of contract cause of action in and of itself seeks compensatory damages in excess of $75,000.

26

27

28

(iii)    Further, in conjunction with his breach of contract claim, plaintiff alleges breach of the implied covenant of good faith and fair dealing ("bad faith").  If plaintiff prevails on

4

this claim, he could claim future policy benefits discounted to present value. In his bad faith cause of action, plaintiff also seeks punitive damages, costs and attorney's fees. (Complaint, 5.)

   (iv) Plaintiff also alleges that he is entitled to recover compensatory damages, punitive damages, costs and attorney's fee for emotional distress in a sum to be determined at trial. (Complaint, 6.)

   (v) Plaintiff argues that he is entitled to an award of exemplary and punitive damages against Defendants. (Complaint, 5, 6.) "Where both actual and punitive damages are recoverable under a complaint each must be considered to the extent claimed in determining jurisdictional amount." *Bell v. Preferred Life Assurance Soc.*, 320 U.S. 238, 240, 64 S.Ct. 5, 88 L.Ed. 15 (1943). This Court must consider the plaintiff's prayer for punitive damages against this defendant in computing the amount necessary for federal jurisdiction. *See* Cal. Civ. Code §3294.

   (vi) Plaintiff claims he is also entitled to attorney's fees that he incurs in bringing suit for this defendant's alleged conduct. (Complaint, 5, 6.) Attorney's fees incurred in obtaining promised contract benefits may be recoverable as an item of tort damage in actions for insurance bad faith. *Brandt v. Superior Ct.,* 37 Cal.3d 813, 210 Cal.Rptr. 211 (1985). If attorney's fees are recoverable by plaintiff, the fee claim is included in determining the amount in controversy. *Goldberg v. CPC Int'l, Inc.*, 678 F.2d 1365, 1367 (9th Cir. 1982).

  9. Numerous cumulative and alternative bases exist to establish that the damages sought by plaintiff exceed this Court's jurisdictional minimum. As shown above, the combination of back benefits allegedly owed, future benefits, general and special damages, punitive damages, and attorney fees, when taken together, establish that the amount in controversy exceeds the jurisdictional minimum of $75,000 set forth in section 1332(a). As the alleged damages far exceed this Court's jurisdictional limit and as the parties are of diverse citizenship, removal is proper.

  10. Therefore, defendant files this Notice of Removal of this action from the Superior Court of the State of California in and for the County of Santa Clara, in which it is now pending, to the District Court of the United States for the Northern District of California.

358151.1

1

2    Dated: June 12, 2008          WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

3

4                                   By: _____
                                        THOMAS M. HERLIHY
5                                       JOHN T. BURNITE
                                        Attorneys for Defendant
6                                       THE NORTHWESTERN MUTUAL LIFE INSURANCE
                                        COMPANY
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                          6
358151.1

1  EDWARD L. NILAND, ESQ. - State Bar #66990
   **NILAND & NILAND**
2  233 Oak Meadow Drive
   Los Gatos, California 95032
3  Telephone:(408) 395-3100
   Fax No. (408) 395-3120
4
   Attorneys for Plaintiff
5

6

7

8              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   IN AND FOR THE COUNTY OF SANTA CLARA

10

11  JOSEPH A. CALLAHAN, M.D.,          No.**1 0 8 C V 1 1 1 8 4 7**

12              Plaintiff,             **COMPLAINT FOR BREACH OF
                                       CONTRACT; PROMISSORY
13       v.                            ESTOPPEL; BREACH OF THE
                                       COVENANT OF GOOD FAITH
14  NORTHWESTERN MUTUAL LIFE          AND FAIR DEALING-INSURANCE
    INSURANCE COMPANY,                 BAD FAITH; INTENTIONAL
15  MATTHEW A. PEMBERTON,             INFLICTION OF EMOTIONAL
    TRICIA HOESLY, SHARON A.          DISTRESS**
16  HYDE, AND DOES 1-50,

17

18              Defendants.

19  _____/

20                     **PRELIMINARY STATEMENT**

21       1.    The Plaintiff, JOSEPH A. CALLAHAN, M.D., is a 58 year old

22  anesthesiologist residing in the City of Palo Alto, situated in Santa Clara County,

23  where the terms of the contract were carried out.

24       2.    Northwestern Mutual Life Insurance Company is, among other things, an

25  issuer and underwriter of disability income insurance, and is licensed to, and doing

26  business in, the State of California.

27       3.    DOES 1 - 50 are persons or entities presently unascertained.

28                            -1-

_____
COMPLAINT

(ENDORSED)
FILED

MAY -5  08

KIRI TORRE
CHIEF EXEC. OFFICER/CLERK
SUPERIOR COURT OF CA
COUNTY OF SANTA CLARA
_____DEPUTY

1    4.    In 1987, Joseph A. Callahan, M.D., and Northwestern Mutual Insurance

2  Company entered into a contract of insurance, executed in Alameda County and

3  performed in Santa Clara County, whereby Joseph A. Callahan, M.D. promised to pay

4  yearly premiums in the amount of $9,000.00, and Northwest Mutual promised to pay

5  income protection insurance benefits if Joseph A. Callahan, M.D. became totally or

6  partially disabled under the terms of Northwestern Mutual's contract of insurance.

7  *Exhibit A*

8    5.    On July 14, 2006, Joseph A. Callahan, M.D. suffered a cardiac episode.

9  He was diagnosed with severe coronary artery disease and, in August, 2006,

10  underwent angioplasty with placement of a stent which requires lifetime blood

11  thinning medication.

12    6.    At the time of this cardiac episode, Dr. Callahan was working with a

13  group of anesthesiologists in Fremont, California. Part of his duties required him to

14  be on 24 hour on-call every other weekend, and to work 24 hour shifts for obstetrical

15  emergencies or other serious conditions 6-8 times per month at Washington Hospital

16  in Fremont. The surgeries he participated in were often protracted and exceedingly

17  stressful.

18    7.    Dr. Callahan's cardiologist diagnosed stress related to his occupation as

19  one of the causes of high blood pressure, uncontrolled lipids, and coronary artery

20  disease.

21    8.    Dr. Kathiresan Sekar at Massachusetts General Heart Center,

22  Cardiovascular Disease Prevention Center, is quoted as follows:

23    "We spent a considerable amount of time discussing his work-
    related stress and the difficulty with maintaining a healthy
24    lifestyle with a vigorous in-house call schedule as an
    anesthesiologist. We discussed the importance of
25    reevaluating his overall priorities and attempting to negotiate
    with his employer regarding restructuring/modification of his
26    job requirements and to allow for better self-care. He is to
    discuss this with his employer. We do feel that continued
27    focus on reducing his job stress and his maintaining healthy
    lifestyle habits would be critical to stop the progression of his

28
                                        -2-

1   coronary disease and possibly even lead to regression. In the
2   long run, the lifestyle interventions will be as important as the
    medical therapy that the patient is currently receiving."
3   *Exhibit B*

4   9.    Dr. Callahan negotiated with his employer and contracted for 6-8 hour
5   work days; 4-5 days per week, eliminating 24 hour on-call duties, and avoiding
6   complicated and protracted surgeries, which resulted in compensation of 1/2 of what
7   he previously earned.

8   10.    Northwestern Mutual's disability policy defines partial disability for its
9   policyholders as:

10      a.    he is unable: to perform one or more of the principal duties of
              his occupation; or to spend as much time at his occupation as
11            he did before the disability started; and

12      b.    he has at least a 20% Loss of Earned Income. *Exhibit A*

13  11.    Dr. Callahan applied for temporary disability benefits (50% of
14  $15,000.00 maximum).

15  12.    Northwestern Mutual considered his claim beginning October 12, 2006
16  and did not deny it until June 27, 2007. *Exhibit C*

17  13.    Even though his cardiologist and psychologist continue to insist that
18  stress reduction is essential to deter progression of his coronary artery disease,
19  Northwestern Mutual has retained its own experts to opine that Dr. Callahan is no
20  longer partially disabled. *Exhibit D*

21  ## FIRST CAUSE OF ACTION - BREACH OF CONTRACT
22  ## NORTHWESTERN MUTUAL ONLY, AND DOES 1 - 50
23
24  Plaintiff hereby incorporates by reference Paragraphs 1 through 13, and
    realleges same as though fully set forth herein.
25
26  The terms of the Northwestern Mutual Contract of Disability Insurance are
    clear, plain, and unequivocal. Dr. Callahan is partially disabled as defined in the
27  contract.
28

-3-

COMPLAINT

1   Dr. Joseph A. Callahan has religiously paid his premiums for over 20 years.

2   Northwestern Mutual Insurance Company's arbitrary denial of coverage is a

3   clear breach of contract.

4   1.4    How the Proportionate Benefit is Determined

5   The Proportionate Benefit is intended to compensate for a loss of
    earned income caused by the Insured's disability. The amount of
6   each monthly benefit is the Full Benefit multiplied by the Insured's
    Loss of Earned Income and divided by his Base Earned Income.
7   Thus, the Proportionate Benefit amount equals:

8   Full                        Loss of Earned Income
    Benefit        X            Base Earned Income . . . *Exhibit A*
9

10   Using this formula, Dr. Joseph A. Callahan is entitled to benefits for the rest of
     his life calculated:
11

12   $15,000.00   X          $250,000.00          = $7,500.00
                             $500,000.00
13

14   ## SECOND CAUSE OF ACTION - PROMISSORY ESTOPPEL

     ## NORTHWESTERN MUTUAL AND MATTHEW A. PEMBERTON ONLY
15   ## AND DOES 1 - 50

16   Plaintiff hereby incorporates by reference Paragraphs 1 through 13, and the

17   First Cause of Action, and realleges same as though fully set forth herein.

18   The sales representative for Northwestern Mutual, Matthew A. Pemberton,

19   Wealth Management Advisor, whose office is in San Francisco, met with Dr.

20   Callahan and specifically represented to Dr. Callahan that because of his high income

21   and the nature of his high stress practice, that it was important for him to purchase

22   multiple policies, indexed for inflation and specifically covering "partial disability"

23   in the event that he needed to reduce his stress levels for health reasons.

24   Dr. Callahan relied on this representation and has, in fact, had to reduce his

25   working time and income for stress-related coronary artery disease.

26   Northwestern Mutual has arbitrarily and in bad faith denied the coverage

27   Plaintiff is entitled to and, by principals of promissory estoppel and detrimental

28                                      -4-

1 reliance, *is* prevented from doing so.

2      Plaintiff, Joseph A. Callahan, M.D. requests a judicial determination that

3 Northwestern Mutual is estopped from denying coverage.

4      **THIRD CAUSE OF ACTION - BREACH OF THE COVENANT OF
        GOOD FAITH AND FAIR DEALING - INSURANCE BAD FAITH**

5

6      **NORTHWESTERN MUTUAL, TRICIA HOESLY, AND SHARON A. HYDE
        ONLY AND DOES 1-50**

7      Plaintiff hereby incorporates by reference Paragraphs 1 through 13, and the

8 First and Second Causes of Action, and realleges same as though fully set forth

9 herein.

10      Joseph A. Callahan, M.D.'s contract of disability insurance with Northwestern

11 Mutual is one of a fiduciary nature and Northwestern Mutual is charged with a duty

12 of good faith and fair dealing that requires Northwestern Mutual to be honest in its

13 dealings with its insured and to act in good faith when making claims decisions and

14 evaluating medical evidence.

15      Joseph A. Callahan, M.D. provided Northwestern Mutual with clear and

16 convincing medical evidence that he is partially disabled from his profession of

17 anaesthesiologist. *Exhibit D*

18      Acting in bad faith and for purposes of selfish financial gain, Northwestern

19 Mutual, through its agents and assigns, denied Joseph A. Callahan, M.D.'s legitimate

20 claim for benefits contracted and paid for.

21      Joseph A. Callahan, M.D. sues for compensatory damages, punitive damages,

22 costs of suit, and attorney's fees and hereby demands a trial by jury.

23      **FOURTH CAUSE OF ACTION**

24

25      **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
        NORTHWESTERN MUTUAL, TRICIA HOESLY, AND SHARON A. HYDE
        ONLY, AND DOES 1 - 50**

26

27      Plaintiff hereby incorporates by reference Paragraphs 1 through 13, and the

28 First, Second, and Third Causes of Action, and realleges same as though fully set

-5-

1  forth herein.

2      Defendant Northwestern Mutual Insurance Company, through its agents and

3  assigns, knew or should have known its bad faith denial of Joseph A. Callahan,

4  M.D.'s valid claim at a time when his income was cut in half because of a stress-

5  related disability would cause him severe emotional distress.

6      Said denial did cause Joseph A. Callahan, M.D. severe emotional distress and

7  said Plaintiff sues for compensatory damage, punitive damage, attorney's fees, costs

8  of suit, and such other further relief as the Court may see fit and hereby demands a

9  trial by jury.

10

11  Date: April 29, 2008                     NILAND & NILAND

12

13                                           _Edward L. Niland_

14                                           EDWARD L. NILAND
                                             Attorney for Plaintiff

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                -6-

**EXHIBIT A**

# Northwestern Mutual Life®

## It is recommended that you...

read your policy.

notify your NML agent or the Company at 720 E. Wisconsin Avenue, Milwaukee, Wis. 53202, of an address change.

call your NML agent for information — particularly on a suggestion to terminate or exchange this policy for another policy or plan.

### Election of Trustees

The members of The Northwestern Mutual Life Insurance Company are its policyholders of insurance policies and deferred annuity contracts. The members exercise control through a Board of Trustees. Elections to the Board are held each year at the annual meeting of members. Members are entitled to vote in person or by proxy.

### Disability Income Policy

### Eligible for Annual Dividends

Non-Cancellable and
Guaranteed Renewable to Age 65

Conditionally Renewable to Age 75 from Age 65 at premium rates then in use by the Company.

MM D 1
California

Countersigned by _____

Licensed Resident Agent

The Northwestern Mutual Life Insurance Company agrees to pay the benefits provided in this policy, subject to its terms and conditions. Signed at Milwaukee, Wisconsin on the Date of Issue.

This disability income policy is guaranteed renewable upon timely payment of premiums to the first policy anniversary after the Insured's 65th birthday and, during that period, can neither be cancelled nor have its terms or premiums changed by the Company.

*[signature]*      *[signature]*

PRESIDENT AND C.E.O.      SECRETARY

**Disability Income Policy**

**Eligible for Annual Dividends**

Non-Cancellable and
Guaranteed Renewable to Age 65

Conditionally Renewable to Age 75 from Age 65 at premium rates then in use by the Company.

**Right To Examine Policy** — Please examine this policy carefully. The Owner may return the policy for any reason within ten days after receiving it. If returned, the policy will be considered void from the beginning and any premium paid will be refunded.

MM D 1
California

# Northwestern Mutual Life®

| | | |
|---|---|---|
| INSURED | JOSEPH A CALLAHAN | |
| POLICY DATE | JUNE 30, 1987 | AGE AND SEX    38   MALE |
| EXCLUSIONS--SEE SECTION 2. | | POLICY NUMBER    D 537 212 |

D 1 (0187)

BENEFITS AND PREMIUMS

DATE OF ISSUE - JUNE 30, 1987

| LAN AND ADDITIONAL BENEFITS | FULL BENEFIT PER MONTH | | QUARTERLY PREMIUM | PAYABLE FOR |
|---|---|---|---|---|
| ISABILITY INCOME | $ 5,000 | $ | 494.50 | 28 YEARS |
| ANNUALLY INDEXING BENEFIT | | | 184.00 | 28 YEARS |

ENEWAL OF COVERAGE BEYOND AGE 65 MAY REQUIRE AN INCREASE IN THE PREMIUM.
EE SECTION 3.

PREMIUM IS PAYABLE ON THE POLICY DATE AND EVERY 3 POLICY MONTHS THEREAFTER.

HE FIRST PREMIUM IS       $678.50.

HE PREMIUM FOR THIS POLICY IS ON A NONSMOKER BASIS.


EGINNING DATE                91ST DAY OF DISABILITY IN THE FIRST 180 DAYS
                             AFTER THE START OF DISABILITY.

AXIMUM BENEFIT PERIOD        TO JUNE 30, 2015, BUT NOT LESS THAN
                             24 MONTHS OF BENEFITS.

NITIAL PERIOD                TO JUNE 30, 2015, BUT NOT LESS THAN
                             24 MONTHS OF BENEFITS.


WNER                 JOSEPH A  CALLAHAN, THE INSURED


| NSURED       JOSEPH A  CALLAHAN | AGE AND SEX | 38   MALE |
|---|---|---|
| OLICY DATE   JUNE 30, 1987 | POLICY NUMBER | D 537 212 |

XCLUSIONS--SEE SECTION 2..

M D1 (01R7)

TABLE OF ANNUAL PREMIUMS
PER $100 OF INCREASE IN FULL BENEFIT

| FOR POLICY YEAR BEGINNING | DISABILITY INCOME | ANNUALLY INDEXING BENEFIT |
|---|---|---|
| 1988 | $  39.80 | $  14.40 |
| 1989 | 41.30 | 14.50 |
| 1990 | 43.00 | 14.70 |
| 1991 | 44.90 | 14.80 |
| 1992 | 46.80 | 15.00 |
| 1993 | 48.70 | 15.20 |
| 1994 | 50.50 | 15.20 |
| 1995 | 52.40 | 15.20 |
| 1996 | 54.30 | 15.20 |
| 1997 | 56.20 | 15.10 |
| 1998 | 57.90 | 14.90 |
| 1999 | 59.20 | 14.60 |
| 2000 | 60.20 | 14.10 |
| 2001 | 60.90 | 13.50 |
| 2002 | 61.40 | 12.70 |
| 2003 | 61.70 | 12.00 |
| 2004 | 61.80 | 11.50 |
| 2005 | 61.80 | 11.30 |
| 2006 | 61.80 | 11.20 |
| 2007 | 61.80 | 11.20 |
| 2008 | 61.80 | 11.20 |
| 2009 | 61.20 | 10.00 |
| 2010 | 61.20 | 10.00 |
| 2011 | 61.20 | 10.00 |
| 2012 | 61.20 | 10.00 |
| 2013 | 61.20 | 10.00 |
| 2014 | 61.20 | 10.00 |

| | | | | |
|---|---|---|---|---|
| INSURED | JOSEPH A  CALLAHAN | | AGE AND SEX | 38   MALE |
| POLICY DATE | JUNE 30, 1987 | | POLICY NUMBER | D 537 212 |

Countersigned by _____

Licensed Resident Agent

**This policy is a legal contract between the Owner and The Northwestern Mutual Life Insurance Company.**

**Read your policy carefully.**

## Guide To Policy Provisions

|  |  | Page |
|---|---|---|
| | SCHEDULE OF BENEFITS AND PREMIUMS | 3 |
| SECTION 1. | **BENEFITS** | 5 |
| | Description of general terms. Full Benefit payable for total disability. Proportionate Benefit payable for partial disability. How the Proportionate Benefit is determined. Transition Benefit. Lifetime benefit payable for Presumptive Disability. Waiver of Premium Benefit. | |
| SECTION 2. | **EXCLUSIONS** | 7 |
| SECTION 3. | **CONDITIONAL RIGHT TO RENEW TO AGE 75** | 8 |
| SECTION 4. | **CLAIMS** | 8 |
| | How to notify the Company of a claim. Proof of disability. How the benefits will be paid. Physical examination may be required. Limits on when you may start a legal action. | |
| SECTION 5. | **OWNERSHIP** | 8 |
| | Rights of the Owner. Assignment as collateral. | |
| SECTION 6. | **PREMIUMS AND REINSTATEMENT** | 9 |
| | Payment of premiums. Grace Period of 31 days to pay premiums. Refund of unused premium at death. How to reinstate the policy. | |
| SECTION 7. | **THE CONTRACT** | 10 |
| | Changes. Incontestability. Misstatement of age. Dividends. Definition of dates. | |
| | **ADDITIONAL BENEFITS** (if any) | Following page 10 |
| | **APPLICATION** | Attached to the policy |

# SECTION 1. BENEFITS

## 1.1 GENERAL TERMS

This policy provides benefits when the Insured is totally or partially disabled. Section 1 describes the benefits of the policy and tells when they are payable. It also gives the meaning of several important terms that are used in the policy.

**Insured and Owner.** The Insured and Owner are named on page 3. The male pronouns used in this policy for the Insured and Owner apply to both males and females.

**Disabilities Covered by the Policy.** Benefits are provided for the Insured's total or partial disability only if:

- the Insured becomes disabled while this policy is in force;

- the Insured is under the care of a licensed physician other than himself during the time he is disabled;

- the disability results from an accident or sickness; and

- the disability is not excluded under Section 2.

**Benefit Terms.** The schedule of Benefits and Premiums (page 3) has a number of important terms that are used in this policy. These terms are:

**Full Benefit.** This is the maximum amount of monthly income payable under the policy.

**Beginning Date.** This is the date on which benefits begin to accrue after the Insured becomes disabled. Benefits are not payable for the time the Insured is disabled before the Beginning Date.

**Maximum Benefit Period.** This is the longest period of time that benefits are payable for disability. In determining the maximum length of time for which benefits are payable, periods of total and partial disability are added together. If page 3 provides that the Maximum Benefit Period has a lifetime benefit for total disability, then see Section 1.7.

**Initial Period.** This is a period of time that starts on the Beginning Date and continues, while the Insured is disabled, for the length of time shown on page 3. The definition of total disability changes after the Initial Period.

**Occupation.** The words "his occupation" mean the occupation of the Insured at the time he becomes disabled. If the Insured is regularly engaged in more than one occupation, all of the occupations of the Insured at the time he becomes disabled will be combined together to be "his occupation".

## 1.2 FULL BENEFIT FOR TOTAL DISABILITY

The Full Benefit is payable for each month of total disability between the Beginning Date and the end of the Maximum Benefit Period.

**Total Disability.** Until the end of the Initial Period, the Insured is totally disabled when he is unable to perform the principal duties of his occupation. After the Initial Period, the Insured is totally disabled when he is unable to perform the principal duties of his occupation and is not gainfully employed in any occupation.

**Benefit Amount for Partial Month.** When a total disability lasts for a part of a month, 1/30th of the Full Benefit will be payable for each day of total disability.

## 1.3 PROPORTIONATE BENEFIT FOR PARTIAL DISABILITY

The Proportionate Benefit is payable for each month of partial disability between the Beginning Date and the end of the Maximum Benefit Period.

**Partial Disability.** The Insured is partially disabled when:

a. he is unable to perform one or more of the principal duties of his occupation; or to spend as much time at his occupation as he did before the disability started; and

b. he has at least a 20% Loss of Earned Income.

Until the Proportionate Benefit has been payable for six months, the Insured need not have a 20% Loss of Earned Income to be partially disabled if: he is unable to perform one or more principal duties which accounted for at least 20% of the time he spent at his occupation before the disability started; or he has at least a 20% loss of time spent at his occupation.

If the Insured qualifies for both the Full and Proportionate Benefit, the Full Benefit only will be paid.

**Benefit Amount for Partial Month.** When a partial disability lasts for a part of a month, 1/30th of the Proportionate Benefit will be payable for each day of partial disability.

## 1.4 HOW THE PROPORTIONATE BENEFIT IS DETERMINED

The Proportionate Benefit is intended to compensate for a loss of earned income caused by the Insured's disability. The amount of each monthly benefit is the Full Benefit multiplied by the Insured's Loss of Earned Income and divided by his Base Earned Income. Thus, the Proportionate Benefit amount equals:

$$\text{Full Benefit} \quad X \quad \frac{\text{Loss of Earned Income}}{\text{Base Earned Income}}$$

However, if the Insured has at least an 80% Loss of Earned Income, the Proportionate Benefit amount will be 100% of the Full Benefit. In no event will the amount payable be more than 100% of the Full Benefit.

**Choice of Benefit Amount for First Six Months.** For each of the first six months in which a Proportionate Benefit is payable, the Owner may choose:

- to receive 50% of the Full Benefit; or
- to receive a Benefit based on the Insured's Loss of Earned Income.

The Owner may alternate between these two choices as to each of the six months. However, the Owner may not change his choice after the Benefit is paid for that month.

The Choice of Benefit Amount does not apply to a Transition Benefit payable under Section 1.5.

**Loss of Earned Income.** This is:

- the Insured's Base Earned Income; less
- his Earned Income for the month for which the Benefit is claimed.

Earned Income is credited to the period in which it is earned, not the period in which income is actually received.

**Earned Income.** Earned Income is:

- the sum of salary, wages, commissions, fees, bonuses, and other compensation or income earned by the Insured from all sources for work performed by him; less
- normal and customary business expenses.

It is determined before the deduction of federal, state and local income taxes.

**Base Earned Income.** During the first 12 months of a disability, Base Earned Income is the average monthly Earned Income of the Insured for:

- a 12 consecutive month period during the 24 month period before the start of disability; or
- any two of the five calendar years before the start of disability.

The period which generates the highest average (and therefore the highest benefit amount) will be used.

After the first 12 months of a disability, Base Earned Income is the average monthly Earned Income of the Insured multiplied by an Indexing Factor. The Indexing Factor is:

- the consumer price index for the current year of disability; divided by
- the consumer price index for the year the disability started.

Thus, after 12 months of a disability, Base Earned Income equals:

$$\text{average monthly Earned Income} \quad X \quad \frac{\text{consumer price index for the current year of disability}}{\text{consumer price index for the year disability started}}$$

In the event the Indexing Factor is less than one, a value of one will be used.

**Consumer Price Index.** The "consumer price index for the year the disability started" is the Consumer Price Index for All Urban Consumers, United States City Average, All Items ("CPI-U") for the fourth month before the start of disability. The "consumer price index for the current year of disability" is the CPI-U for the fourth month before the most recent anniversary of the start of disability.

The CPI-U is published by the Bureau of Labor Statistics. If the method for determining the CPI-U is changed, or if it is no longer published, it will be replaced by some other index found by the Company to serve the same purpose.

**Proof of Earned Income.** The Company may require proof, including income tax returns, of the amount of Earned Income for periods before and after the start of the disability.

## 1.5 TRANSITION BENEFIT

The Company will pay a Proportionate Benefit for up to the first 12 months after the Insured's recovery from a disability, provided:

- the Insured was disabled until the Beginning Date;
- the Insured has returned to full-time employment;
- the Insured has at least a 20% Loss of Earned Income for the month for which the benefit is claimed; and
- the month for which the benefit is claimed is within the Maximum Benefit Period.

The amount of this Benefit will be determined under Section 1.4.

This Benefit is payable for up to 12 months for each separate disability. For any month this Benefit is payable, premiums will be waived.

MMD.1.(0187).

## 1.6 TRANSPLANT DONOR

If the Insured donates an organ for transplant

## 1.9 WAIVER OF PREMIUM BENEFIT

The Company will

MMD.1.(0187).    6

## 1.6 TRANSPLANT DONOR

If the Insured donates an organ for transplant to another person, a disability caused by the donation will be considered as caused by sickness.

## 1.7 LIFETIME BENEFIT FOR TOTAL DISABILITY

If page 3 provides that the Maximum Benefit Period has a lifetime benefit for total disability, then the Full Benefit is payable as long as total disability continues during the lifetime of the insured, provided:

- the Insured is totally disabled on the policy anniversary that follows his 60th birthday; and
- the total disability continues beyond the policy anniversary that follows his 65th birthday.

## 1.8 LIFETIME BENEFIT FOR PRESUMPTIVE TOTAL DISABILITY

Even if the Insured is able to work, he will be considered totally disabled if he incurs the total and irrecoverable loss of:

- sight in both eyes;
- use of both hands;
- use of both feet;
- use of one hand and one foot;
- speech; or
- hearing in both ears.

The Full Benefit is payable for this loss provided: the loss occurs while this policy is in force; the loss occurs before the first policy anniversary that follows the 65th birthday of the Insured; the loss results from an accident or sickness; and the loss is not excluded under Section 2. The Insured does not need to be under the care of a physician.

The Full Benefit for the loss:

- is payable monthly;
- starts with the date of loss, not the Beginning Date;
- is payable for as long as the loss continues during the lifetime of the Insured; and
- is in lieu of other benefits payable for total or partial disability.

## 1.9 WAIVER OF PREMIUM BENEFIT

The Company will waive premiums which become due on this policy while the Insured is totally or partially disabled if:

- the disability lasts for at least 90 days; or
- the disability lasts beyond the Beginning Date, if sooner.

The Waiver of Premium Benefit is not limited by the Maximum Benefit Period.

If premiums are waived, the Company will also refund that portion of a premium paid which applies to a period of disability beyond the policy month in which the disability began. If a premium is to be waived on a policy anniversary, an annual premium will be waived.

The Company will not waive the payment of premiums after the end of the disability (except where the waiver continues under Section 1.5). The Owner may then keep the policy in force by resuming the payment of premiums as they become due.

## 1.10 REHABILITATION BENEFIT

At the Insured's request, the Company will consider joining in a program to rehabilitate the Insured. The Company's role in the program will be determined by written agreement with the Insured. Benefits will continue during the program under the terms of the agreement.

## 1.11 DISABILITY WITH MULTIPLE CAUSES

If the Insured is disabled from more than one cause, the amount and duration of benefits will not be more than that for any one of the causes.

## 1.12 BENEFITS FOR SEPARATE DISABILITIES

Each separate time the Insured is disabled, a new Initial Period, Beginning Date and Maximum Benefit Period start. A disability is separate, and not a continuation of one that started earlier, if:

- the cause of the later disability is not medically related to the cause of the earlier one, and the insured had resumed on a full-time basis the principal duties of an occupation for at least 30 consecutive days; or
- the cause of the later disability is related to the cause of the earlier one, and the later disability starts at least 6 months after the end of the earlier one.

# SECTION 2. EXCLUSIONS

## 2.1 PRE-EXISTING CONDITIONS

There will be no benefits for a disability or loss that:

- starts within two years after the Date of Issue; and
- results from an accident that occurred or from a sickness that appeared within two years before the Date of Issue and was not disclosed in the application.

A sickness is considered to have appeared if it would have caused a prudent person to seek medical attention.

## 2.2 OTHER EXCLUSIONS

There will be no benefits for a disability or loss that:

- is caused or contributed to by an act or incident of war, declared or undeclared; or
- is excluded from coverage by an Agreement for Limitation of Coverage.

MM D1    7

# SECTION 3. CONDITIONAL RIGHT TO RENEW TO AGE 75

On each policy anniversary between the Insured's 65th and 75th birthdays, the Owner may renew this policy for one year if the Insured is actively and gainfully employed on a full-time basis. To renew this policy, the Owner must send a written request to the Company each year. This right to renew ends on the first anniversary on which the Insured is not so employed or on which the Owner chooses not to renew the policy.

For a policy that is renewed:

- benefits are payable only for total disability; and

- the premium for each year of renewal will be based on the Insured's age and the Company's rates in use at the time of renewal.

# SECTION 4. CLAIMS

## 4.1 NOTICE OF CLAIM

Written notice of claim must be given to the Company within 60 days after the start of any loss covered by this policy. If the notice cannot be given within 60 days, it must be given as soon as reasonably possible. The notice should:

- give the Insured's name and policy number; and

- be sent to the Home Office or be given to an authorized agent of the Company. The Home Office is located at:

720 East Wisconsin Avenue
Milwaukee, Wisconsin 53202.

## 4.2 CLAIM FORMS

The Company will furnish claim forms within 15 days after receiving notice of claim. If claim forms are not furnished within that period, written proof of disability may be made without the use of the Company's forms.

## 4.3 PROOF OF DISABILITY

Written proof of disability must be given to the Company within 90 days after the end of each monthly period for which benefits are claimed. If the proof is not given within the 90 days, the claim will not be

affected if the proof is given as soon as reasonably possible.

## 4.4 TIME OF PAYMENT OF CLAIMS

Benefits due under this policy will be paid monthly.

## 4.5 PAYMENT OF CLAIMS

Benefits will be paid to the Owner or to his estate.

## 4.6 MEDICAL EXAMINATION

The Company, at its own expense, may have the Insured examined as often as reasonably necessary in connection with a claim. This will be done by a physician of the Company's choice.

## 4.7 LEGAL ACTIONS

No legal action may be brought for benefits under this policy within 60 days after written proof of disability has been given. No legal action may be brought after three years (or a longer period that is required by law) from the time written proof is required to be given.

# SECTION 5. OWNERSHIP

## 5.1 POLICY RIGHTS

All policy rights may be exercised by the Owner, or his successor or transferee.

## 5.2 TRANSFER OF OWNERSHIP

The Owner may transfer the ownership of this policy. Written proof of transfer satisfactory to the Company must be received at its Home Office. The transfer will take effect as of the date it was signed. The Company may require that the policy be sent to its Home Office for endorsement to show the transfer.

## 5.3 COLLATERAL ASSIGNMENT

The Owner may assign this policy as collateral security. The Company is not responsible for the validity or effect of a collateral assignment. The Company will be charged with notice of the assignment only if a written assignment is received at the Home Office.

A collateral assignee is not an Owner. A collateral assignment is not a transfer of ownership. Ownership can be transferred only by complying with Section 5.2.

## 6.1 PREMIUMS

**Payment.** All premiums after the first are payable at the Home Office or to an authorized agent. A premium must be paid on or before its due date. A receipt signed by an officer of the Company will be furnished on request.

**Frequency.** Premiums may be paid annually, semiannually or quarterly at the published rates of the Company. A change in premium frequency will take effect on the Company's acceptance of the premium for the new frequency. Premiums may be paid on any other frequency approved by the Company.

**Grace Period.** A grace period of 31 days will be allowed for payment of a premium that is not paid on its due date. This policy will be in full force during this period.

The policy will terminate at the end of the grace period if the premium is not paid.

**Premium Refund at Death.** The Company will refund that portion of any premium paid for a period beyond the date of the Insured's death.

## 6.2 REINSTATEMENT

**Within Late Payment Period.** The late payment period is the first 31 days after the grace period. Within the late payment period, the policy will be reinstated as of the date the overdue premium is paid. No evidence of insurability will be required.

**After the Late Payment Period.** After the late payment period, the cost to reinstate must be paid to the Company. The Company may also require an application for reinstatement and evidence of insurability. The policy will be reinstated as of the date the cost to reinstate was paid to the Company if:

- the application is approved by the Company; or

- notice that the application has been disapproved is not given within 45 days from the date the Company receives the application.

The policy will be reinstated as of the date the Company accepts payment of the cost to reinstate if the Company does not require an application.

**Coverage.** If no evidence of insurability is required, the reinstated policy will cover only a disability that starts after the date of reinstatement. If evidence of insurability is required:

- the reinstated policy will cover only a disability that results from an accident that occurs, or from a sickness that first appears, after the date of reinstatement; and

- the Company may attach new provisions and limitations to the policy at the time of reinstatement. All other rights of the Owner and the Company will remain the same.

**Duty with Armed Forces.** If the policy terminates while the Insured is on active duty with the armed forces of any nation or group of nations, the policy may be reinstated without evidence of insurability. The policy will be reinstated as of the date a written request and the pro-rata premium for coverage until the next premium due date are received by the Company. The request must be received:

- no later than 90 days after the Insured's release from active duty; and

- no later than 5 years after the due date of the unpaid premium.

# SECTION 7. THE CONTRACT

## 7.1 ENTIRE CONTRACT; CHANGES

This policy with the application and attached endorsements is the entire contract between the Owner and the Company. No change in this policy is valid unless approved by an officer of the Company. The Company may require that the policy be sent to it to be endorsed to show a change. No agent has authority to change the policy or to waive any of its provisions.

## 7.2 INCONTESTABILITY

In issuing this policy, the Company has relied on the application. The Company may rescind the policy or deny a claim due to a misstatement in the application. However, after this policy has been in force for two years from the Date of Issue, no misstatement in the application may be used to rescind the policy or to deny a claim for a disability or loss that starts after the two year period.

In addition, a claim may be denied on the basis that a disability or loss is caused by a Pre-Existing Condition (see Section 2.1). However, the Company may not reduce or deny a claim on that basis if the disability or loss:

- starts after two years from the Date of Issue; and

- is not excluded from coverage by an Agreement for Limitation of Coverage.

## 7.3 CHANGE OF PLAN

The Owner may change this policy to any plan of disability insurance agreed to by the Owner and the Company. The change will be subject to:

- payment of required costs; and

- compliance with other conditions required by the Company.

All premiums and dividends after the date of change will be the same as though the new plan had been in effect since the Policy Date.

## 7.4 MISSTATED AGE

If the age of the Insured has been misstated, the benefits will be those which the premiums paid would have purchased at the correct age.

## 7.5 CONFORMITY WITH STATE STATUTES

Any provisions of this policy which, on the Date of Issue, are in conflict with the statutes of the state in which the Owner resides on that Date are amended to conform to such statutes.

## 7.6 DIVIDENDS

This policy will share in the divisible surplus, if any, of the Company. Divisible surplus is determined annually. This policy's share will be credited as an annual dividend.

Dividends will be:

- used to reduce premiums; or

- paid to the Owner when premiums are being waived.

## 7.7 DATES

Provided the first premium is paid, this policy will take effect on the Date of Issue. Policy months, years and anniversaries are computed from the Policy Date. Both dates are shown on page 3 of this policy.

## 7.8 TERMINATION

If premiums are paid when due, this policy will not terminate until the first policy anniversary following the 65th birthday of the Insured or, if later, when the right to renew the policy ends (see Section 3). However, if the Insured is disabled on the date determined above, the termination will not take effect until benefits are no longer payable due to that disability.

# ANNUALLY INDEXING BENEFIT

## 1. THE BENEFIT

The Company will annually index the Full Benefit that is shown on page 3 to reflect increases in consumer price levels. Indexing, which is subject to the limits described in sections 3 and 4 of this Benefit, will start on the first policy anniversary and will continue on each policy anniversary after that, regardless of the Insured's health. Increased coverage which results from the indexing will remain in effect for as long as the policy is in force. When the Proportionate Benefit is payable under the terms of the policy, it will be based on the Full Benefit as increased.

## 2. PREMIUM

The first premium for this Benefit is shown on page 3. The premium for this Benefit and the premium for this policy will increase on the same date as each increase in the Full Benefit. The amount of premium increase will be determined by applying the premium rates that are shown on page 3A to the amount of the increase in the Full Benefit.

When the Full Benefit is increased, the Company will provide an amendment to the schedule of Benefits and Premiums.

## 3. HOW AN INCREASED FULL BENEFIT IS DETERMINED

The Full Benefit for a policy year will be the Full Benefit for the prior policy year multiplied by the Indexing Factor. The Indexing Factor is:

- the consumer price index for the current policy year; divided by
- the consumer price index for the prior policy year.

Thus, the new Full Benefit equals:

$$\text{prior year Full Benefit} \times \frac{\text{consumer price index for the current policy year}}{\text{consumer price index for the prior policy year}}$$

**Protection Against Decreases.** The Full Benefit will not decrease as a result of a decrease in the consumer price index. If the Indexing Factor is less than one, a value of one will be used.

**Annual Limit on Increases.** The Full Benefit for a policy year will not be more than 108% of the Full Benefit for the prior policy year.

**Consumer Price Index.** The "consumer price index for the current policy year" is the Consumer Price Index for All Urban Consumers, United States City Average, All Items (CPI-U) for the fourth month before the start of the current policy year. The "consumer price index for the prior policy year" is the CPI-U for the fourth month before the start of the prior policy year.

The CPI-U is published by the Bureau of Labor Statistics. If the method for determining the CPI-U is changed, or if it is no longer published, it will be replaced by some other index found by the Company to serve the same purpose.

## 4. WHEN INCREASES IN THE FULL BENEFIT OCCUR

An increase in the Full Benefit will occur on each policy anniversary on which the Indexing Factor is greater than one if the Owner has the right to receive increases at that time. The right to receive increases starts on the first policy anniversary and continues, regardless of the Insured's health, until:

- the Owner refuses an increase; or
- the Insured does not meet the Company's financial underwriting standards on a Review Date.

**Refusing an Increase.** The Owner can refuse to accept an increase:

- by not paying the increased premium resulting from this Benefit; or
- by sending a written notice to the Home Office of the Company before the increase takes effect.

**Review Dates.** A Review Date occurs on every fifth policy anniversary. On each Review Date, the Insured must meet the Company's financial underwriting standards that are then in effect to receive an increase on that date and on each policy anniversary before the next Review Date. These standards include:

- the Insured's earned and unearned income;
- his net worth;
- the amount and types of disability coverage that the Insured has or for which he may be eligible after a qualifying period of employment; and
- the Company's issue limits.

Financial underwriting will be waived if disability benefits are being paid or premiums are being waived under this policy on a Review Date.

**Regaining the Right to Receive Further Increases.** If increases have stopped as described above, the Owner will regain the right to receive further increases starting on the first policy anniversary after the Insured meets all of the Company's standards of insurability that are then in effect. These standards include the Insured's health, activities, and occupation as well as his financial condition.

In addition, the Owner will regain the right to receive further increases if the Insured is disabled on a policy anniversary and benefits are payable or premiums are being waived under the policy for the disability. The right to receive increases will resume on the first policy anniversary after the Insured became disabled and will continue while the Insured remains disabled. In order to receive further increases in the Full Benefit after the Insured recovers, the Owner must regain the right to receive further increases as provided in this section.

MMD 1 AIB

(over)

**Providing Evidence of Insurability.** Satisfactory evidence of insurability must be provided to the Company no more than 90 days and no less than 45 days before each Review Date or the policy anniversary on which indexing is to take effect.

**Last Increase.** The last available increase in the Full Benefit will be on:
- the first policy anniversary after the 64th birthday of the Insured; or if later,
- the second policy anniversary after the date benefits become payable for a disability.

However, the last available increase will be the first policy anniversary after the 69th birthday of the Insured if:
- the Insured has been continuously disabled since the first policy anniversary after his 65th birthday; and

- the Maximum Benefit Period stated on page 3 is to age 70.

**Conditional Renewal Excluded.** This Benefit will not be in force if the policy is in force under the Conditional Right to Renew to Age 75.

## 5. TERMINATION

This Benefit will terminate on the earliest of the following dates:
- the date the policy terminates;
- the date the Home Office receives the Owner's written request; or
- the end of the policy year of the last available increase determined under section 4.

*Peter W. Brown*

Secretary
THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY

MMD 1 AIB

## AMENDMENT OF APPLICATION

Mutual Life

720 East Wisconsin Avenue
Milwaukee, Wisconsin 53202

**Policy No.**  D 537 212

**Date** June 30, 1987

**Region/Division** WR

**G.A. No.**  003

**Insured** Joseph A  Callahan

**Sol. Agent No.**  38523

Supplementing and amending this application  I agree to terminate the insurance listed below on its next premium due date.  I understand Northwestern Mutual Life is relying on this agreement and would not have issued a policy without this agreement.  If the insurance listed below is not terminated on its next premium due date, the policy issued by Northwestern Mutual Life will be rescinded and all premiums will be returned.  I authorize Northwestern Mutual Life to contact each listed insurance company after the premium due date to confirm that the insurance listed below has been terminated.

| <u>Insurer</u> | <u>Amount</u> | <u>Premium Due Date</u> |
|---|---|---|
| Provident | $5,000 | September, 1987 |

This amendment is to be attached to and made part of this application

Date Signed ___|___|___
              Month  Day  Year

Signed_____
              SIGNATURE OF APPLICANT IN FULL

JC:dr

Signature of Insured if other than Applicant _____

17-0694 (Rev. 9-83)

dj 8106

ATTACH THIS SIGNED **DUPLICATE** TO THE POLICY

057496

# NORTHWESTERN MUTUAL LIFE
### INSURANCE COMPANY
### MILWAUKEE, WISCONSIN 53202

No. D53722

## DISABILITY INSURANCE APPLICATION

☐ Life & Disability Insurance

**101. INSURED** (Print)   JOSEPH    A.   CALLAHAN
First            Middle Initial          Last

☐ Male  ☐ Female

**102. A. INSURED'S DATE OF BIRTH** 9 / 21 / 49
Month  Day  Year

**B. PLACE OF BIRTH** SHREVEPORT, LA
(If other than USA, indicate country)

**103. APPLICANT, if other than Insured**

First _____ Middle Initial _____ Last _____   Relationship to Insured _____

**104. RESIDENCE OF INSURED** 26 BEAUFORT HARBOUR
This address will be used for all of the insured's policies.   Street & No. or RFD
ALAMEDA, ALAMEDA, CA 94501
City        County        State   Zip Code

**105. POLICY NOTICES** Send premium and other notices regarding this policy
to: ☑ Insured  ☐ Applicant  ☐ Owner in 113  ☐ Other _____
at: ☑ Insured's address in 104, or _____ (Full Name)
_____
Street & No. or RFD
_____
City      State      Zip Code

**106.** Has an application or informal inquiry ever been made to Northwestern Mutual Life for annuity, life or disability insurance on the life of the Insured?  ☐ Yes  ☑ No    If yes, the last policy number is _____

## 107. INSURED'S OCCUPATION

**A.** What is the Insured's primary occupation? PHYSICIAN

**B.** List any other occupations of the insured: NONE

**C.** What are the Insured's duties and the percent of time spent at each duty for each occupation? PRIVATE PRACTICE ANESTHESIA AT ST AGNES HOSP., FRESNO CA STARTING 7-6-87 – CURRENTLY IN USN AS AN ANESTHESIO

**D.** Employer: Name (1) U.S.N.  OAK KNOLL NAVAL HOSP (2) SELF
Address MOUNTAIN BL., OAKLAND, CA 94627
Street & No. or RFD         City      State   Zip Code

**E.** How long has the Insured been employed by this employer? 11 1/2 YRS IN USN; 1 YR IN
If less than 2 years, state the Insured's prior occupation and employer. _____ PRIVATE PRA

**F.** Is the Insured actively at work on a full-time basis without medical restrictions?
☑ Yes  ☐ No  If no, explain. _____

**G.** Does the Insured intend to change occupation(s) or employer(s) within the next six months?
☑ Yes  ☐ No  If yes, explain. STARTING PRIVATE PRACTICE 7-6-87 FULL T

## 108. Complete this question *only* if exercising an ADDITIONAL PURCHASE BENEFIT OPTION.

**A.** State the policy number(s) under which the option is being exercised. _____

**B.** This application is: ☐ Regular Purchase  ☐ Advance Purchase (Complete item C. below)

**C.** If this is an Advance Purchase, the event is:

☐ Marriage   Name of: ☐ Spouse ☐ Child
First      Middle Initial      Last
☐ Birth of child   Date and place of marriage, birth, or final decree of adoption:
☐ Adoption of child  _____ / _____ / _____  _____  _____  _____
Month  Day  Year    City   County   State

☐ Increase in Annual Earned Income: $_____ Actual — One calendar year ago (Should agree with 118c)
$_____ Estimate — Current calendar year (Should agree with 118c)

90-1 D.J. (0385)

(page 1)

**109. POLICY APPLIED FOR**

| | Monthly Benefit | Maximum Benefit Period | Beginning Date | Initial Period To Age 65 | Initial Period To Age 70 | Guaranteed Acceptance (Prior Home Office approval required) |
|---|---|---|---|---|---|---|
| **DISABILITY INCOME POLICY** | | | | | | |
| ☑ Level premium | $ 5,000 | 65 | 91 | ☒ | ☐ | ☐ |
| ☐ Step rate premium | $ ___ | ___ | ___ | ☐ | ☐ | ☐ |
| **SOCIAL SECURITY SUBSTITUTE POLICY** | | | | | | |
| ☐ Level premium | $ ___ | to age 65 | ___ | ☐ | | ☐ |
| ☐ Step rate premium | $ ___ | to age 65 | ___ | ☐ | | ☐ |
| **DISABILITY OVERHEAD EXPENSE POLICY** | | | | | | |
| ☐ Business | $ ___ | ___ | ___ | | | |
| ☐ Professional | $ ___ | ___ | ___ | | | |

**110. ADDITIONAL BENEFITS**

(If more than one policy is applied for, indicate to which policy(ies) each benefit should be attached.)

☐ Additional Purchase Benefit (APB)    $ _____  _____

☐ Social Security Substitute Benefit (SSS) $ _____  _____
Amt. on each Purchase Date

☐ Annually Renewable Disability Income Benefit (ARDI) $ ___  _____
Monthly Benefit

☐ Indexed Income Benefit (IIB)  _____
Monthly Benefit

☑ Annually Indexing Disability Benefit (AIB)  _____

---

**111.** If Northwestern Mutual Life is not able to issue the policy and any additional benefits as applied for, should the Company issue a policy if it can do so only in a smaller amount, or on a different plan, or without an additional benefit?  ☑ Yes  ☐ No

**112. SPECIAL DATING**

Prepaid:  ☐ Short term — Policy Date will coincide with ISA Payment Date.
~~☑ Spec~~ _____ _____
Month  Day  Year

Non-prepaid:  ☑ ~~Specified future date~~    ☐ Date to save age    ☐ Backdate to ___ / ___ / ___
Month  Day  Year                                                    Month  Day  Year

**113.** The **OWNER** of the Disability Insurance policy(ies) will be:

☑ Insured    ☐ Applicant    ☐ Other _____
(Full Name)

**114. PREMIUM PAYABLE**    ☐ Annually    ☐ Semiannually    ☑ Quarterly

**115.** Has the premium for the policy applied for been paid to the agent in exchange for the Conditional Disability Insurance Agreement with the same number as this application?    ☐ Yes  ☑ No

**116. A.** Will the Insured's employer pay for this disability insurance with no part of the premium included in the Insured's taxable income?    ☐ Yes  ☑ No

**B.** The Insured's employer is a:    ☑ Sole Proprietor    ☐ Partnership    ☐ Corporation    ☐ Subchapter S Corporation
☑ Other (Specify) _U S NAVY TO 7-1-87_

**C.** Does the Insured have an ownership interest in the business?    ☑ Yes    ☑ No ← U S NAVY
If yes, what is the percentage? _____ %.

_SELF EMPLOYMENT INCOME_

DISABILITY INSURANCE APPLICAT

| INSURED | J O S E P H | | A . | C A L L A H A N | |
| First | | | Middle Initial | | Last |

The following information (pages 3, 4 and 5) is required because Northwestern Mutual Life's underwriting rules limit the amount of disability insurance on the Insured in this company and elsewhere.

**117.**

**A. DISABILITY COVERAGES** List and describe all disability benefits including:
- disability insurance;
- group disability insurance;
- private and government pension or retirement plans;
- salary continuation plans;
- association plans;
- credit insurance plans;
- overhead expense insurance;
- Northwestern Mutual Life disability insurance; and
- any other coverage which provides disability benefits.

Also include any coverage for which the insured will become eligible within the next five years after a qualifying period of employment has been met.

Identify:   **(I)** in force, **(P)** Pending or **(C)** Contemplated.    If none, check ☑**NONE.**

| Insurer | Type | Benefit Amount | Benefit Period Accident    Sickness | | I, P, or C | Check if Offset by Social Security | Check if Non-contributory |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**B.** Will the insurance applied for replace any Northwestern Mutual Life disability insurance?   ☐ Yes   ☑ No
If yes, complete the Conditional Surrender form 17-0789, and the agent should submit any required papers.

**C.** Will the insurance applied for replace disability insurance from a source other than Northwestern Mutual Life? ☐ Yes ☑ No
If yes, complete the information below, and the agent should submit any required papers.

*When issuing any insurance as a result of this application, Northwestern Mutual Life will rely on the fact that the coverage listed below can and will be terminated on the stated date (usually the next premium due date). If the coverage listed below is not terminated on that date, any policy issued and accepted will be rescinded and all premiums will be returned. Northwestern Mutual Life may contact any listed insurer after the stated date to confirm that the coverage has been terminated.*

| Insurance Company | Group or Association Name | Policy Number | Amount to be Replaced | Premium Due Date/ Termination Date |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

90-1 D.I. (0385)

**A. EARNED INCOME** State the Insured's Earned Income from the Insured's occupation(s) reported on the personal federal income tax return, IRS Form 1040. *Note:* Do not list undeclared income. Limit nontaxable fringe benefits to those which are asked for in 118 A.1. below.

|  | Prior Calendar Year Jan. 1-Dec. 31 | Estimate Current Calendar Year Jan. 1-Dec. 31 |
|---|---|---|
| **1. From primary occupation:** | | |
| If the Insured is salaried, state the actual salary earned last year and the current salary. If the salary has recently changed, show the date the change took effect in "Remarks."  *US NAVY* | $ 58,000 | $ 25,000  *½ YR TO 7-1* |
| If the Insured is a commissioned salesperson, state the total commissions. | 0 | 0 |
| State any bonus(es) that the Insured receives on a regular basis. Do not state if included above. | 0 | 0 |
| If the Insured is an unincorporated sole proprietor or a partner in an unincorporated partnership, state the Insured's share of gross income less the cost of goods sold. | 85,000 | *½ TIME TO 7-1 FULL TIME FROM 7-1-8* 120,000 |
| State any nontaxable fringe benefits which are not included above, such as deferred compensation or pension plan contributions, that would cease if the Insured were disabled. Give details and source of this income in "Remarks." | 0 | 0 |
| **2. From any other occupation:** If none, so state. | 0 | 0 |
| **3. Total earned income:** Add lines A.1 through A.2. | 85,000 | 145,000 |
| **B. EXPENSES** State the Insured's tax deductible business expenses from all occupations. If none, so state. | 8,000 | 8,000 |
| **C. NET EARNED INCOME** Line A.3 minus line B. | | |
| **D. UNEARNED INCOME** State that part of the Insured's net personal unearned income in excess of $5000. This includes capital gains, interest, dividends, tax exempt unearned income, income from other investments, net rental income, pensions, annuities, and alimony. If none, so state. | 0 | 0 |
| **E. INSURABLE INCOME** Line C minus line D. | 135,000 | 137,000 |

**F. NET WORTH** Is the Insured's net worth, exclusive of primary residence, greater than $2,000,000? (Include the Insured's assets less liabilities such as mortgages, loans and debts.) ☐ Yes ☑ No

If "Yes" complete section below. State fair market value less any associated indebtedness.

| Cash savings, stocks, bonds | $_____ | Real estate (exclude primary residence) | $_____ |
|---|---|---|---|
| Business equity (exclude goodwill) | $_____ | Other (Give details in "Remarks" below) | $_____ |
| Personal property | $_____ | | |

**G. REMARKS**

_____

_____

_____

_____

# DISABILITY INSURANCE APPLICATION

INSURED: | J | O | S | E | P | H | | | | A | . | | C | A | L | L | A | H | A | N | | |

First               Middle Initial               Last

---

**119.** Complete this question only if applying for a DISABILITY OVERHEAD EXPENSE POLICY.

**A.** What is the Insured's share of the overhead expenses or the Insured's share of ownership if this is an incorporated business? _____ %

**B.** What is the amount of the Insured's share of the typical monthly expenses?

| | | |
|---|---|---|
| $_____ Rent | $_____ Maintenance | $_____ Accountant's Fees |
| $_____ Heat | $_____ Real Estate Taxes | $_____ Insurance Premiums |
| $_____ Telephone | $_____ Other Taxes (Specify) | $_____ Employees' Salaries (Professional DOE) |
| $_____ Electricity | _____ | $_____ Other Normal Expenses (Itemize) |
| $_____ Professional Dues and License Fees | $_____ Interest on Business Loans | _____ |
| | $_____ Depreciation | _____ |
| | | $_____ **TOTAL** |

**C.** How many people are employed by this firm? (Do not include the Insured in the total.)
_____ Full time     _____ Part time

**D.** How many of the employees are in the same occupation as the Insured? (Do not include the Insured in the total.)
_____ Full time     _____ Part time

---

The insured consents to this application and declares that the answers and statements made on this application are correctly recorded, complete and true to the best of his knowledge and belief. Statements in this application are representations and not warranties.

It is agreed that:

(1) If the premium is not paid when the application is signed, no insurance will be in effect. The insurance will take effect at the time the policy is delivered and the premium is paid if the answers and statements in the application are still true to the best of the Insured's knowledge and belief.

(2) If the premium is paid when the application is taken, no disability insurance will have been in effect if Section 1. of the Conditional Disability Insurance Agreement applies.

(3) For each separate period of disability no benefits will be payable until the Beginning Date in question 109. Receipt of an outline of coverage for the policy applied for is acknowledged.

(4) No agent is authorized to make or alter contracts or to waive any of the Company's rights or requirements.

_____
Signature of Insured (if other than Applicant)

_____
Signature of Applicant

Signed at _ALAMEDA, ALAMEDA, CA_
City      County      State

Date _6, 30, 87_
Month Day Year

_Matthew A Pemberton_
Signature of Licensed Agent

(page 5

THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY

**TO BE COMPLETED BY THE INSURED OR INFORMANT**

INSURED (Please print)  J O S E P H | | | A | C A L L A H A N
First       Middle Initial       Last

If submitted for purpose other than a new insurance application, please indicate:

☐ Policy Change    ☐ Conversion    ☐ Adding _____ Benefit    ☐ Reinstatement    ☐ Rating Reduction

for Policy(ies) Number _____

☐ Payor Benefit for Applicant (Payor) _____
First    Middle Initial    Last    Relationship to Insured _____

Payor's Date of Birth _____ Policy Number _____
Month / Day / Year

**20.** Have you ever had life, disability, or health insurance declined, rated, modified, cancelled, or not renewed? *(if yes, explain in REMARKS)* ☐ Yes ☑ No

**21.** When was your last previous examination or application for life, disability, or accidental death insurance? Month **7** Year **1977** Company **USBA**

**22.** Indicate below whether any other life insurance on your life is Individual (Ind) or Group (Grp) and identify in Force (I), Pending (P) or Contemplated (C). If none, check: ☐ **NONE**

| Insurer | Ind or Grp | Life Insurance Amount | Accidental Death Amount | I, P. or C |
|---------|-----------|----------------------|------------------------|-----------|
| USBA | | 200,000 | | I |
| SGLI | | 50,000 | | |
| | | | | |
| | | | | |

**23.** Marital Status: Single, Widowed ☐ or Divorced   ☑ Married

**24.** Citizen of: ☑ U.S.A. ☐ Other _____ If other: Visa Type _____ Visa No. _____

**25.** Do you contemplate leaving the United States of America for travel or residence? *(if yes, explain in REMARKS)* ☐ Yes ☑ No

**26.** (Not required for disability insurance)
A. What is your occupation(s)? _____
What are your duties? _____

B. Employer(s) _____
Name
_____
Street & No. or R.F.D.
_____
City    State    Zip Code

C. How long so employed? _____
*(if less than 2 years, explain in REMARKS)*

**27.** (Not required if under age 17)
Are you a member of, or do you contemplate joining any branch of the Armed Forces, the R.O.T.C., the National Guard, the U.S. Public Health Service, the Coast Guard, or any other component of the Armed Forces Reserve either on an active or inactive status? *(if yes, complete Military Section 90-5)* ☑ Yes ☐ No

**28.** (Not required if under age 17)
Except as a fare paying passenger on a regularly scheduled flight, have you flown within the past 3 years, or do you contemplate flying within the past 3 years, or do you contemplate flying in the future? *(if yes, complete Aviation Section 90-5)* ☐ Yes ☑ No

**29.** (Not required if under age 10)
Have you within the past 2 years participated in or do you contemplate participating in racing (automobile, snowmobile, motorcycle, boat or go-kart) scuba or skin diving, sky diving, hang gliding, mountain climbing or rodeos? *(if yes, complete Avocation Section 90-6)* ☐ Yes ☑ No

**30.** (Not required if under age 16)
A. What is your Automobile Driver's License Number?
# C6573027   State CA
or, ☐ I do not drive an automobile.

B. In the past 3 years have you been in a motor vehicle accident, charged with a moving violation of any motor vehicle law, or had your license restricted or revoked? *(if yes, explain in C., D. and/or REMARKS)* ☑ Yes ☐ No

C. Moving Violations within the past 3 years:

| Date | Type and Details (Speeding, Reckless Driving, Driving While Intoxicated) | Action (Citation, Fine) | Accident (Yes or No) |
|------|------------------------------------------------------------------------|------------------------|---------------------|
| SUMMER 1985 | SPEEDING | FINE | NO |

D. Details on any accidents: (Include date, citations, damage amounts, injuries.)

**REMARKS:**

I declare that my answers and statements are correctly recorded, complete and true to the best of my knowledge and belief. Statements in this application are representations and not warranties.

Date **6 30 87**
Month Day Year

X _____
Signature of Insured (or Informant)
Signature not required if reverse side, 90-4 also completed

90-3 (0983)

(0386)

DECLARATIONS TO PARAMEDICAL EXAMINER
THE NORTHWESTERN MUTUAL LIFE
MILWAUKEE, WISC.

CHECK PURPOSE
☐ Life, EP.
☐ POI
☐ Add Benefit
☐ Payor Benefit
☐ Reconsideration
☐ Reinstatement

INSURED: C A L L A H A N    A    J o s e p h

**31.** A. Have you smoked cigarettes in the past 10 years? ☐ Yes ☑ No

B. Are you using tobacco in any other form?
If yes, specify _____ ☐ Yes ☑ No

C. Present cigarette smokers:
(1) How many cigarettes do you smoke per day? _____
(Number of cigarettes not number of packs)
(2) How many years have you smoked? _____

D. Past cigarette smokers:
(1) How many cigarettes did you smoke per day? _____
(Number of cigarettes not number of packs)
(2) How many years did you smoke? _____
(3) When did you quit smoking? _____ Mo. Yr.

**32.** Are you using any medication or drugs? ☐ Yes ☑ No

**33.** In the last 10 years, have you been treated for or had any indication of:

A. Disorder of eyes, ears, nose or throat? ☐ Yes ☑ No

B. Dizzy or fainting spells, seizures or convulsions, recurrent headache, paralysis or stroke, mental, nervous or psychiatric disorder? ☐ Yes ☑ No

C. Persistent shortness of breath, cough, blood spitting; bronchitis, asthma, emphysema, tuberculosis or other lung or respiratory disorder? ☐ Yes ☑ No

D. Chest pain, discomfort or tightness, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disorder of the heart or blood vessels? ☐ Yes ☑ No

E. Jaundice, intestinal bleeding; ulcer, hernia, colitis, diverticulitis, recurrent indigestion or other disorder of the stomach, intestines, liver, gall bladder or pancreas? ☐ Yes ☑ No

F. Sugar, albumin, blood in urine; venereal disease; stone or other disorder of kidney, bladder, prostate or reproductive organs? ☐ Yes ☑ No

G. Diabetes; thyroid or other endocrine disorders? ☐ Yes ☑ No

H. Rheumatism, arthritis, gout, or disorder of the muscles or bones, spine, back or joints? ☐ Yes ☑ No

I. Deformity, lameness or amputation? ☐ Yes ☑ No

J. Disorder of the skin or lymph glands, unexplained fevers, AIDS or immune deficiency disease, cyst, tumor or cancer? ☐ Yes ☑ No

K. Allergies; anemia or other disorder of the blood? ☑ Yes ☐ No

**34.** In the last 10 years, have you sought or received advice or treatment for use of alcohol or drugs? ☐ Yes ☑ No

**35.** Are you pregnant? ☐ Yes ☑ No

**36.** Other than above, have you within the past 5 years:
A. Had any physician or practitioner examine, advise or treat you? ☑ Yes ☐ No

B. Been a patient in a hospital, clinic or medical facility? ☐ Yes ☐ No

C. Had EKG, X-ray, other test? ☑ Yes ☐ No

D. Been advised to have any test, hospitalization, or surgery which was not completed? ☐ Yes ☐ No

**37.** Have you ever requested or received a pension, benefits or payment because of an injury, sickness or disability? ☐ Yes ☑ No

**38.** Family History: Diabetes, cancer, melanoma, heart or kidney disease, mental illness or suicide? ☐ Yes ☐ No

| | Age if Living | Family History or Cause of Death | Age at Death |
|---|---|---|---|
| Father | 60 | | |
| Mother | 60 | | |
| Brothers and Sisters | 35 | 29 | |

**39.** A. Have you lost weight in the past 6 months? ☐ Yes ☑ No
If yes, loss was _____ lbs.

**42.** Do you have a personal physician? ☐ Yes ☐ No
Name OAKland Navel Hospital
Address Mountain Blvd.
City OAKland State CA Zip 94627
Date last seen 6/22/87 Reason Physical
Mo. Day Yr.

**43.** Remarks. Give details of "Yes" answers. Identify question number. State signs, symptoms and diagnosis of illness and name and full address of each physician consulted and the dates consulted:

33 K Allergies → Sulfa.

36-A & C → Complete Physical exam as of 6-22-87, Blood, EKG - Xray, Per Navel Discharg all Test results were good OAKland Navel Hospital Mountain Blvd. OAKland, 946

38 → Father has Heart disease - presentel Age 60, has had Angina for the past 6 years Controled with inderal.

I declare that my answers and statements are correctly recorded, complete and true to the best of my knowledge and belief. Statements in this application are representations and not warranties.

Signed in my presence _____
Paramedical Examiner

_____
Signature of Insured (or Informant)

Date 6 / 23 / 87
Month Day Year

90-4C (0186)

NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY

Insured: | J O S E P H | | A | | C A L L A H A N |
First _____ Middle Initial _____ Last

## AVIATION SECTION    (90-3, Question 28)

| TYPES OF FLYING | Flight Hours Last 12 Months | | Flight Hours 1 to 2 Years Ago | | Flight Hours 2 to 3 Years Ago | | Flight Hours Estimate Next 12 Months | |
|---|---|---|---|---|---|---|---|---|
| | Pilot/Crew M | Passenger | Pilot/Crew M | Passenger | Pilot/Crew M | Passenger | Pilot/Crew M | Passenger |
| Private | | | | | | | | |
| Student in Training | | | | | | | | |
| Company-Owned | | | | | | | | |
| Military | | | | | | | | |
| Non-Scheduled & Chartered | | | | | | | | |
| Scheduled Airlines | | | | | | | | |
| Other, Specify | | | | | | | | |

**51. Have you ever piloted an aircraft or held a pilot's license, medical certificate or student's permit?** ☐ Yes ☐ No
*(If "Yes," complete A through G)*

A. What type of license or certificate do you have?
☐ Flight Instructor  ☐ ATR  ☐ Student
☐ Private  ☐ Commercial

B. What ratings do you have?
☐ Instrument Flight Rating  ☐ Multi-engine/land
☐ Multi-engine/sea  ☐ Other (specify) _____

C. Enter class and date of latest FAA medical certificate:
Class _____ Date _____

D. Is any of your flying outside the U.S.A.? ☐ Yes ☐ No
*(If "Yes," explain in Remarks)*

E. Have you ever been in an aircraft accident or been grounded, fined or reprimanded? ☐ Yes ☐ No
*(If "Yes," explain in Remarks)*

F. Type of aircraft used: *(Check and enter total lifetime hours flown for each one.)*
☐ Single engine _____ hrs.  ☐ Home built _____ hrs.
☐ Helicopter _____ hrs.  ☐ Ultralight _____ hrs.
☐ Multi-engine _____ hrs.  ☐ Glider _____ hrs.
☐ Crop dusting or aerial application _____ hrs.  ☐ Balloon _____ hrs.
☐ Other _____ hrs.

G. Date of last flight as pilot or crew member:
Civilian _____ Military _____

**52.** Currently, what percentage of your total flying time is done in a multi-engine aircraft? _____ %

**53.** If you do crop-dusting or other aerial application, is the aircraft specially built (not converted) for aerial application? ☐ Yes ☐ No

**54.** If your aviation activity (past, present or future) does not permit the policy applied for to be issued standard and without restrictions, the policy should be issued:
Check one: ☐ Classified
☐ With an Aviation Exclusion Rider
*(Complete and submit proper rider.)*

## MILITARY SECTION    (90-3, Question 27)

**61.** Have you had active service in the Armed Forces or the U.S. Public Health Service? ☑ Yes ☐ No

**62.** Do you contemplate enlisting or volunteering for active duty in any branch of the Armed Forces? ☐ Yes ☑ No
*(If "Yes," explain in Remarks. State date, branch of service and length of service)*

**63.** Do you contemplate flying as a pilot or crew member or paratrooper in a military capacity? ☐ Yes ☑ No
*(If "Yes," complete Aviation Section)*

**64.** Are you now a member of the Armed Forces or the U.S. Public Health Service? ☑ Yes ☐ No
*(If "Yes," check one and answer A through E)*
☑ Regular Armed Forces  ☐ Active-Reserves
☐ Coast Guard  ☐ National Guard
☐ U.S. Public Health Service  ☐ Other _____

A. Branch of service: USN  Rank or Grade: O 4
B. Military Occupational Speciality: PHYSICIAN
C. Have you been alerted, received orders for, or had any indication of an overseas assignment or active service? *(If "Yes," explain in Remarks)* ☐ Yes ☑ No
D. Do you expect to volunteer for additional active duty after your present service period ends? ☐ Yes ☑ No
E. Expected date of separation: Mo. 7 - 1  Yr. 87

### REMARKS    (Aviation or Military)

→ NOT BEYOND SEPERATION DATE OF 7-1-87.

... eclare that my answers and statements are correctly recorded, complete and true to the best of my knowledge and belief. ...tements in this application are representations and not warranties.

...te 6/30/87    *Matthew A Pemberton*    X _____
Mo.  Day  Yr.    Signature of Licensed Agent    Signature of Insured (or Informant)

983)

**EXHIBIT B**





**MASSACHUSETTS
GENERAL HOSPITAL**

# HEART CENTER

Cardiovascular Disease
Prevention Center

25 New Chardon Street | Suite 301
Boston, MA 02114
Tel: 617-726-1843
Fax: 617-726-2203
Email: mghcvdprevention@partners.org
www.massgeneral.org/cardiacprevention

RE: Joseph Callahan MGH# 444-18-99

11/21/2006

### Reason for visit
Second opinion regarding secondary prevention post right coronary artery angioplasty/stent.

### Interval History
This is a 57-year-old gentleman who presented in October 2006 with exertional substernal chest discomfort relieved by rest. He had a stress echo, which showed ECG with ST depression but normal wall motion. He went on to coronary angiography, which showed a nearly occluded dominant right coronary artery, a 60% mid circumflex lesion, and LAD with only minimal irregularities. He had an angioplasty and stent of the right coronary artery with 3.5 x 18 mm Cypher stent.

Since the procedure, the patient has not had any recurrent chest pain. He had an exercise treadmill test on 08/18/2006 where he exercised to a heart rate of 144 with a normal ECG and a normal scan.

His cardiac risk factors prior to coronary angioplasty included dyslipidemia and a strong family history of coronary artery disease. His mother has had bypass surgery. His father had CAD, MI, and CABG at 52; and his brother had a CAD and CABG at 42.

The patient does not have any tobacco history. No history of high blood pressure. He is now active, exercising six times a week, 60 minutes a day. He has had a fair amount of work stress over the years due to his job as an anesthesiologist, which involves regular 24-hour in-house call.

His weight is 166 pounds. He has no history of diabetes. His fasting blood sugar recently was 105. He has a family history of diabetes.

His lipids post intervention are still pending.

### Past medical history
History of migraines.

### Medications (Confirmed)
aspirin 81 mg 2 tabs qd
Coenzyme q10
Fish oil
Lipitor 40 mg qd
Lotrel 5/20 mg 1 tab qd
Nasonex
Niaspan 1000 mg bid
Plavix 75 mg qd
Zetia 10 mg qd

### Allergies
Sulfonamide allergy: He is allergic to sulfa.

### Social history
He lives with his wife and three children, ages 22, 14, and 11. He works as an anesthesiologist.





A Teaching Affiliate
of Harvard Medical School

**MASSACHUSETTS GENERAL HOSPITAL**

**HEART CENTER**

-Neck: No carotid bruits. 2+ carotids. JVP was flat
-Chest: Lungs were clear
-Cardiac: RRR. S1 and S2 normal. No S3, no S4, no murmurs
-Abdomen: Positive bowel sounds. Nontender and nondistended
-Extremities: No edema

**Cardiovascular Disease Prevention Center**

Assessment and plan
The patient is a 57-year-old gentleman with active issues:
1. Coronary artery disease status post RCA angioplasty and stent with a medication-coated stent.
2. Strong family history of coronary artery disease.
3. Dyslipidemia.
4. Impaired fasting glucose with a blood sugar of 105.
5. Blood pressure elevated on examination today.

25 New Chardon Street I Suite 301
Boston, MA 02114
Tel: 617-726-1843
Fax: 617-726-2203
Email: mghcvdprevention@partners.org
www.massgeneral.org/cardiacprevention

In terms of secondary prevention issues, the patient is on a very good medical program. Further fine tuning could involve:
1. Continuation of Plavix indefinitely.
2. Consideration of a 24-hour blood pressure monitor to define the average blood pressure and determine if the Lotrel 5/20 mg is adequate therapy.
3. Close monitoring of the fasting blood glucose, and if it continues to creep up, consider the cessation of Niaspan given the known side effect of inducing glucose intolerance.

We discussed lifestyle issues including continued regular physical activity and potentially losing another 5 to 10 pounds to an ideal weight in the high 150s. The patient is motivated to do this.

We spent a considerable amount of time discussing his work-related stress and the difficulty with maintaining a healthy lifestyle with a vigorous in-house call schedule as an anesthesiologist. We discussed the importance of reevaluating his overall priorities and attempting to negotiate with his employer regarding restructuring/modification of his job requirements and to allow for better self-care. He is to discuss this with his employer. We do feel that continued focus on reducing his job stress and his maintaining healthy lifestyle habits would be critical to stop the progression of his coronary disease and possibly even lead to regression. In the long run, the lifestyle interventions will be as important as the medical therapy that the patient is currently receiving.

Signed electronically by Kathiresan, Sekar M.D. on 2006-12-05 13:18:26

**EXHIBIT C**

TRICIA HOESLY, FLMI
**Disability Benefits Specialist**
Disability Benefits Division
Disability Income Department
1-800-748-9493, Press 1, Ext. 6613866

**Northwestern Mutual®**

June 27, 2007

DR JOSEPH A CALLAHAN
955 HAMILTON AVE
PALO ALTO  CA 94301

Re:     Joseph A. Callahan
        D1046623 D537212 D630679

Dear Dr. Callahan:

Thank you for your patience while we have been reviewing your claim for disability benefits. We have completed our review at this time. Based on our review of the information gathered in connection with your claim, regrettable I am unable to approve additional disability benefits on your policies at this time. Please allow me to explain further.

As background, we received your Request for Disability Benefits on August 28, 2006. You listed your occupation as an Anesthesiologist working approximately 55 hours per week depending on your operating room schedule. Your duties included 60% operating room, 3% pre and post-operative care, 2% hospital rounds, and 25% 24 hours rotations on obstetrics doing labor epidurals. You requested an onset date of July 14, 2006 at which time you reduced your working hours to 16 hours per week. We spoke in depth about your request for benefits on September 21, 2006. You indicated that you began experiencing episodes of chest pain in June 2006. An echocardiogram was performed on July 14, 2006 revealing a proximal occlusion in your right coronary artery. You ceased all work activity on August 11, 2006 when you had an angioplasty with stent placement. You reported that you were able to return to work in a limited capacity on August 21, 2006 working 50% operating room, 3% pre-post operative room, 2% hospital rounds, 45% administrative chairman and no longer took on call duties averaging 25-30 hours per week. You completed your cardiac rehab program with good results and continue a workout, diet modification and stress reduction regime on your own to manage your medical condition. It is our understanding that your are claiming ongoing limitations from your occupation based on your symptoms of anxiety (during emergency cases) and fatigue.

While we continued our claim review, you received the 50% partial disability beneift from October 12, 2006 (Beginning Date using July 14, 2006 as your date of onset) to February 12, 2007 and waived the premiums on your policies on an accommodation basis.

Our medical consultants reviewed the medical records received to date in the file. Based on this review, our medical consultants do not see a medical basis for any cardiac related limitations in your ability to perform your pre-disability occupation beyond November 11, 2006. This opinion is based on your successful angioplasty, normal ejection fraction, and stress test demonstrating a good exercise tolerance with an absence of chest pain and ischemia. We also had an outside medical consultant review your medical records in February 2007. This specialist concurred with our findings that there is no medical evidence supporting limitations after November 11, 2006 as a result of your cardiac condition.

Dr. Joseph A. Callahan
June 27, 2007
Page 2

Our consulting psychiatrist also reviewed the available medical records in the file including Dr. Stewart's records. Based on his review of this information he did not find any evidence supporting limitations or necessary work modifications due to a psychiatric condition or stress.

Since you have already been paid the 50% partial disability benefit on an accommodation basis to February 12, 2007 no additional benefits are due. We will not be requesting reimbursement of the benefits paid beyond November 11, 2006 at this time.

Premium billing will commence as of the following policy anniversaries:

| Policy No. | Anniversary |
| --- | --- |
| D1046623 | March 23, 2008 |
| D537212 | September 28, 2007 |
| D630679 | October 25, 2007 |

If you believe that the claim has been wrongfully denied or rejected, you may have the matter reviewed by the Department of Insurance. The address and telephone number of the Department is:

> California Department of Insurance
> Claims Services Bureau
> 300 South Spring Street, South Tower
> Los Angeles, CA 90013
> (800) 927-4357 (within California)
> (213) 897-8921 (out of state)

I am sorry that our claim decision is not favorable of your request for permanent partial disability. If you disagree with this decision and want to appeal it, please submit within 30 days any information or documentation that you would like us to consider and that you believe supports your position.

Sincerely,

*Tricia Hoesly*

Tricia Hoesly

**EXHIBIT  D**

**Judith Stewart Ph.D. MPH**
**945 Middlefield Road**
**Palo Alto, CA 94301**
**(650) 482-9010**

License No. PSY 11876

July 23, 2007

To Whom It May Concern:

I have been asked to provide my opinion regarding Dr. Joseph Callahan's psychological condition as it relates to his inability to perform his job in the manner he had been prior to last summer's episode of unstable angina.

I have been seeing Dr. Callahan on essentially a weekly basis for psychotherapy since the end of March, 2007. The goals of the treatment include an examination of his reactions to stressful situations, his current stress coping strategies, development of new coping techniques, and exploration of his adjustment to his current reduced work schedule.

Dr. Callahan describes an intense and prolonged stress reaction when faced with unpredictable or potentially extremely challenging situations. When working his pre-illness schedule he describes being covered in sweat with his hands shaking if he was late for surgery prep or in line for an emergency case, and approaching Sunday night with a feeling of profound dread. We have identified that he tends towards hypervigilance and excessive worry, and a strong propensity to mentally rehearse his reactions to anticipated challenging events and to ruminate on his actions once a stressful event is over. These psychological tendencies may well have contributed to Dr. Callahan's competence and effectiveness as an anesthesiologist. However this type of psychological response is consistent with being on physiological "alert" with frequent and prolonged exposure to stress hormones ultimately deleterious to the body. The level of threat in his environment (e.g., frequent unpredictable or unexpected events; environmental demands experienced as potentially greater than psychological and physiological resources; insufficient down time available to allow recovery between incidents) is a critical component in this cycle. As the threat level increases it not only triggers these mental processing propensities but also makes it progressively more difficult for Dr. Callahan to effectively utilize the array of stress coping techniques he has acquired.

His current work environment is far more predictable and less demanding than that which he followed for many years prior to the manifestation of his cardiac problems. He still occasionally experiences extremely long work days which impede his ability to practice the stress coping activities (e.g., exercise, yoga, meditation) which he is trying to make integral parts of his daily routine. However, overall he is tolerating this reduced schedule and is accepting that although he may not be able to work as he once did, he is still able to make a professional contribution.

My understanding is that both his cardiologist and a second opinion obtained from Mass General recommend that Dr. Callahan continue to work a reduced schedule. I concur.

*Judith Stewart Ph.D. MPH*

# C. Jeffrey Carlson, MD

*Interventional and Preventive Cardiology*

American Board of Internal Medicine Diplomat
Internal Medicine
Cardiovascular Diseases
Interventional Cardiology

Fellow, American Heart Association
Fellow, American College of Cardiology
Fellow, American College of Chest Physicians

August 3, 2007

Edward L. Niland
Niland & Niland
233 Oak Meadow Drive
Los Gatos, CA 95032

Ref: Letter of July 16, 2007 concerning my opinion about Dr. Joseph
Callahan's partial disability.

Dear Mr. Niland:

By November of 2006, I felt that Dr. Callahan had recovered well from his
Coronary event in August and could gradually return to a more normal work load as
an Anesthesiologist. He noted fleeting chest pains and palpitations but stress tests
were reassuring. As he took on more responsibility doing more complex anesthesia,
it became clear that he was becoming more anxious and perceived that his new
stress level was causing more palpitations and chest discomfort. In addition to his
usual medication, I started him on low dose anti-anxiety medication and he began
seeing a Psychologist. Although our objective tests have shown normal heart
function, his subjective feelings of chest pain, anxiety, and fatigue are directly
related to the complexity of his work load. These subjective symptoms translate into
higher and more labile blood pressure and heart rate.

My opinion is that he should limit his work time to 6 hours or less per day.
He should stop night and week-end call. I think that out-patient anesthesia is less
stressful for him than in-patient. He should also limit himself to low risk patients and
to procedures that can be completed in less than 4 hours. The goal of these changes
is to improve his blood pressure and lipid management thus reducing his risk of
future cardiac and other vascular events.

Sincerely yours,

C. Jeffrey Carlson, MD

1895 Mowry Avenue, Suite 100
Fremont, CA 94538

(510) 792-2012
FAX 792-7986

TRICIA HOESLY, FLMI
Disability Benefits Specialist
Disability Benefits Division
Disability Income Department
1-800-748-9493, Press 1, Ext. 6613866

**Northwestern Mutual®**

October 31, 2007

NILAND AND NILAND
EDWARD NILAND
233 OAK MEADOW DR
LOS GATOS CA 95032

Re:    Joseph A. Callahan
       D1046623 D537212 D630679

Dear Mr. Niland:

I have completed my review of your appeal request and the additional medical records we received from Dr. Carlson and Judith Stewart PhD.

Unfortunately, this additional information does not change my original decision as explained in my June 27, 2007 letter to Dr. Callahan. Another copy of this letter is enclosed for your convenience.

Dr. Callahan's claim has now been referred to a senior management member for additional review. This individual will contact you directly after their review of the file has been completed in order to respond to your concerns and address the decision.

If you believe that the claim has been wrongfully denied or rejected, you may have the matter reviewed by the Department of Insurance. The address and telephone number of the Department is:

California Department of Insurance
Claims Services Bureau
300 South Spring Street, South Tower
Los Angeles, CA 90013
(800) 927-4357 (within California)
(213) 897-8921 (out of state)

Thank you for your patience during our review. If you have any questions in regard to the above, please feel free to contact me.

Sincerely,

*Tricia Hoesly*

Tricia Hoesly

Enclosure

SHARON A HYDE
Asst Director - DI Benefits/LTC Claims
Disability Benefits Division
Disability Income Department
1-800-748-9493, Press 1, Ext. 6613102

 Northwestern Mutual®

November 15, 2007

EDWARD L NILAND
NILAND NILAND
233 OAK MEADOW DR
LOS GATOS  CA 95032

Re:    Joseph A. Callahan
       D1046623 D537212 D630679

Dear Mr. Niland:

Dr. Callahan's file has been referred to me with regard to his appeal of Ms. Hoesly's determination that he is not eligible for disability benefits. Thank you for your patience as I reviewed all of the information in the file. I am writing to let you know that I concur with Ms. Hoesly's decision.

I have nothing to add to Ms. Hoesly's initial claim determination as she explained it to Dr. Callahan in her letter of June 27. In response to her letter you provided separate letters from Drs. Carlson and Stewart for our consideration. Dr. Carlson's letter was sent for review to the same physician who had reviewed the previous medical record; she is board certified in internal medicine with a subcertification in cardiovascular disease. Her primary specialty is cardiovascular disease with a secondary specialty in emergency medicine. Our consulting psychiatrist, who had likewise previously reviewed the medical record, reviewed Dr. Stewart's letter. With the new information provided, the physicians' opinions remain unchanged. Our medical director also reviewed all of the information and opinions and is in agreement that there is no basis for limitations beyond November 11, 2006.

The cardiovascular physician advises us that there is no accepted standard of care or medical literature to support Dr. Carlson's opinion that a reduced work schedule will result in improvement in blood pressure or lipid management or that it will reduce Dr. Callahan's risk of future cardiac and other vascular events. She cites that "Dr. Callahan has stable coronary artery disease, with a stress echocardiographic study from 10/2006 demonstrating 150% of predicted exercise capacity, without ischemia, arrhythmia, or clinical symptoms." She went on to tell us that "[i]n all likelihood, Dr. Callahan will develop further cardiac disease and vascular disease, due to the fact that he is an aging individual and has the presence of some vascular disease at this time." According to my review, then, Dr. Callahan is not now disabled from a cardiovascular standpoint; what may or may not happen in the future is not a basis for a disability claim today. The contracts do not provide benefits for risk of relapse or a potential future disability.

Our consulting psychiatrist finds no psychiatric limitations and comments that Dr. Stewart's opinion is speculative and based on possible future issues. He goes on to say that he is unfamiliar with scientific studies that quantify how much stress hormone it takes to have the

Edward L. Niland
November 15, 2007
Page 2

"deleterious body consequences" that she implies are happening to Dr. Callahan as a result of his pre-disability work schedule. He believes this to be a physiological/medical/pathological issue rather than a psychiatric issue.

Based on these opinions, then, I don't find there to be proof of disability. Proof is established when all of the information considered in its totality leads one to the conclusion that the insured is unable to perform one or more of the substantial and material duties of the occupation or to spend as much time performing them. Without medical proof of a current, disabling condition, then, we have no choice according to the terms of the contract but to deny Dr. Callahan's claim.

One final comment. In your letter of August 14 you take the position that "[t]he covenant of good faith and fair dealing requires an insurer to give deference to the treating physicians when those opinions differ from the opinions of retained consultants." This is untrue. The covenant of good faith and fair dealing requires an insurer to diligently pursue a thorough, fair, and objective investigation of a claim. You provided case law in support of your position; I direct you to the 2003 Supreme Court decision in _Black & Decker Disability Plan v Nord_ where the court held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician... ."

As we have previously stated, if you or Dr. Callahan believe that the claim has been wrongfully denied or rejected, you may have the matter reviewed by the Department of Insurance. The address and telephone number of the Department is:

California Department of Insurance
Claims Services Bureau
300 South Spring Street, South Tower
Los Angeles, CA 90013
(800) 927-4357 (within California)
(213) 897-8921 (out of state)

Sincerely,

Sharon A. Hyde

# SUMMONS
## (CITACION JUDICIAL)

SUM-100

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,
MATTHEW A. PEMBERTON, TRICIA HOESLY, SHARON A.
HYDE, AND DOES 1-50

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JOSEPH A. CALLAHAN, M.D.

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

ENDORSED
FILED

MAY -5 08

KIRI TORRE
CHIEF EXEC. OFFICER/CLERK
SUPERIOR COURT OF CA
COUNTY OF SANTA CLARA
_____ DEPUTY

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.   A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.  If you cannot pay the filing fee, ask the court clerk for a fee waiver form.  If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Santa Clara County Superior Court
191 North First Street
San Jose, CA 95113

CASE NUMBER
*(Número del Caso):* **08 CV 111847**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Edward L. Niland     Niland & Niland     Bar No. 66990     (408) 395-3100
233 Oak Meadow Drive, Los Gatos, CA 95032

DATE:
*(Fecha)* **MAY - 5 2008**    Kiri Torre    Clerk, by _____, Deputy
Chief Executive Officer/Clerk    *(Secretario)*    J. Cao-Nguyen    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

SUMMONS

Code of Civil Procedure §§ 412.20, 465
American LegalNet, Inc.
www.USCourtForms.com

## CIVIL LAWSUIT NOTICE

ATTACHMENT CV-5012

Superior Court of California, County of Santa Clara
191 N. First St., San Jose, CA 95113

CASE NUMBER: **1 0 8 C V 1 1 1 8 4 7**

### READ THIS ENTIRE FORM

_PLAINTIFFS_ (the person(s) suing):  Within 60 days after filing the lawsuit, you must serve each defendant with the _Complaint, Summons_, an _Alternative Dispute Resolution (ADR) Information Sheet_, and a copy of this _Civil Lawsuit Notice_, and you must file written proof of such service.

---

_DEFENDANTS_ (The person(s) being sued):  You must do each of the following to protect your rights:

1. You must file a written response to the _Complaint_, in the Clerk's Office of the Court, within 30 days of the date the _Summons_ and _Complaint_ were served on you;
2. You must send a copy of your written response to the plaintiff; and
3. You must attend the first Case Management Conference.

   **Warning:** If you do not do these three things, you may automatically lose this case.

---

_RULES AND FORMS:_  You must follow the California Rules of Court (CRC) and the Santa Clara County Superior Court Local Civil Rules and use proper forms.  You can get legal information, view the rules and get forms, free of charge, from the Self-Service Center at 99 Notre Dame Avenue, San Jose (408-882-2900 x-2926), or from:

- State Rules and Judicial Council Forms:  www.courtinfo.ca.gov/forms and www.courtinfo.ca.gov/rules
- Local Rules and Forms:  http://www.scsuperiorcourt.org/civil/rule1toc.htm
- Rose Printing: 408-293-8177 or becky@rose-printing.com (there is a charge for forms)

For other local legal information, visit the Court's Self-Service website www.scselfservice.org and select "Civil."

_CASE MANAGEMENT CONFERENCE (CMC):_  You must meet with the other parties and discuss the case, in person or by telephone, at least 30 calendar days before the CMC.  You must also fill out, file and serve a _Case Management Statement_ (Judicial Council form CM-110) at least 15 calendar days before the CMC.

_You or your attorney must appear at the CMC.  You may ask to appear by telephone – see Local Civil Rule 8._

---

Your Case Management Judge is: _Neal A Cabrinha_ _____ Department: __10__

The 1st CMC is scheduled for: (Completed by Clerk of Court)

Date: __SEP 3 0 2008__ Time: __3:45 PM__ in Department __10__

The next CMC is scheduled for: (Completed by party if the 1st CMC was continued or has passed)

Date: _____ Time: _____ in Department _____

---

_ALTERNATIVE DISPUTE RESOLUTION (ADR):_  If all parties have appeared and filed a completed _ADR Stipulation Form_ (local form CV-5008) at least 15 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference.  Visit the Court's website at www.scsuperiorcourt.org/civil/ADR/ or call the ADR Administrator (408-882-2100 x-2530) for a list of ADR providers and their qualifications, services, and fees.

_WARNING:_ Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
## ALTERNATIVE DISPUTE RESOLUTION
### INFORMATION SHEET / CIVIL DIVISION

Many cases can be resolved to the satisfaction of all parties without the necessity of traditional litigation, which can be expensive, time consuming, and stressful. The Court finds that it is in the best interests of the parties that they participate in alternatives to traditional litigation, including arbitration, mediation, neutral evaluation, special masters and referees, and settlement conferences. Therefore, all matters shall be referred to an appropriate form of Alternative Dispute Resolution (ADR) before they are set for trial, unless there is good cause to dispense with the ADR requirement.

*What is ADR?*

ADR is the general term for a wide variety of dispute resolution processes that are alternatives to litigation. Types of ADR processes include mediation, arbitration, neutral evaluation, special masters and referees, and settlement conferences, among others forms.

*What are the advantages of choosing ADR instead of litigation?*

ADR can have a number of advantages over litigation:

< **ADR can save time.** A dispute can be resolved in a matter of months, or even weeks, while litigation can take years.

< **ADR can save money.** Attorney's fees, court costs, and expert fees can be reduced or avoided altogether.

< **ADR provides more participation.** Parties have more opportunities with ADR to express their interests and concerns, instead of focusing exclusively on legal rights.

< **ADR provides more control and flexibility.** Parties can choose the ADR process that is most likely to bring a satisfactory resolution to their dispute.

< **ADR can reduce stress.** ADR encourages cooperation and communication, while discouraging the adversarial atmosphere of litigation. Surveys of parties who have participated in an ADR process have found much greater satisfaction than with parties who have gone through litigation.

*What are the main forms of ADR offered by the Court?*

< **Mediation** is an informal, confidential process in which a neutral party (the mediator) assists the parties in understanding their own interests, the interests of the other parties, and the practical and legal realities they all face. The mediator then helps the parties to explore options and arrive at a mutually acceptable resolution of the dispute. The mediator does not decide the dispute. The parties do.

< Mediation may be appropriate when:
    < The parties want a non-adversary procedure
    < The parties have a continuing business or personal relationship
    < Communication problems are interfering with a resolution
    < There is an emotional element involved
    < The parties are interested in an injunction, consent decree, or other form of equitable relief

*-over-*

---

ALTERNATIVE DISPUTE RESOLUTION INFORMATION SHEET/ CIVIL DIVISION

<     **Arbitration** is a normally informal process in which the neutral (the arbitrator) decides the dispute after hearing the evidence and arguments of the parties. The parties can agree to binding or non-binding arbitration. Binding arbitration is designed to give the parties a resolution of their dispute when they cannot agree by themselves or with a mediator. If the arbitration is non-binding, any party can reject the arbitrator's decision and request a trial.

    Arbitration may be appropriate when:
<     The action is for personal injury, property damage, or breach of contract
<     Only monetary damages are sought
<     Witness testimony, under oath, is desired
<     An advisory opinion is sought from an experienced litigator (if a non-binding arbitration)

<     **Neutral evaluation** is an informal process in which a neutral party (the evaluator) reviews the case with counsel and gives a non-binding assessment of the strengths and weaknesses on each side and the likely outcome. The neutral can help parties to identify issues, prepare stipulations, and draft discovery plans. The parties may use the neutral's evaluation to discuss settlement.

    Neutral evaluation may be appropriate when:
<     The parties are far apart in their view of the law or value of the case
<     The case involves a technical issue in which the evaluator has expertise
<     Case planning assistance would be helpful and would save legal fees and costs
<     The parties are interested in an injunction, consent decree, or other form of equitable relief

<     **Special masters and referees** are neutral parties who may be appointed by the court to obtain information or to make specific fact findings that may lead to a resolution of a dispute.

    Special masters and referees can be particularly effective in complex cases with a number of parties, like construction disputes.

<     **Settlement conferences** are informal processes in which the neutral (a judge or an experienced attorney) meets with the parties or their attorneys, hears the facts of the dispute, and normally suggests a resolution that the parties may accept or use as a basis for further negotiations.

    Settlement conferences can be effective when the authority or expertise of the judge or experienced attorney may help the parties reach a resolution.

### *What kind of disputes can be resolved by ADR?*

    Although some disputes must go to court, almost any dispute can be resolved through ADR. This includes disputes involving business matters; civil rights; corporations; construction; consumer protection; contracts; copyrights; defamation; disabilities; discrimination; employment; environmental problems; harassment; health care; housing; insurance; intellectual property; labor; landlord/tenant; media; medical malpractice and other professional negligence; neighborhood problems; partnerships; patents; personal injury; probate; product liability; property damage; real estate; securities; and sports, among other matters.

### *Where can you get assistance with selecting an appropriate form of ADR and a neutral for your case, for information about ADR procedures, or for other questions about ADR?*

    *Contact:*
    Santa Clara County Superior Court
    ADR Administrator
    408-882-2530

            Santa Clara County DRPA Coordinator
            408-792-2704

---

ALTERNATIVE DISPUTE RESOLUTION INFORMATION SHEET/ CIVIL DIVISION

ATTORNEY OR PARTY WITHOUT AN ATTORNEY *(Name, State Bar number, and address)*

CM-110

FOR COURT USE ONLY

TELEPHONE NO.:                    FAX NO. *(Optional)*:

E-MAIL ADDRESS *(Optional)*:

ATTORNEY FOR *(Name)*:

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**

STREET ADDRESS:

MAILING ADDRESS:

CITY AND ZIP CODE:

BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

### CASE MANAGEMENT STATEMENT

| (Check one): | ☐ UNLIMITED CASE<br>(Amount demanded<br>exceeds $25,000) | ☐ LIMITED CASE<br>(Amount demanded is $25,000<br>or less) |
|---|---|---|

CASE NUMBER:

**A CASE MANAGEMENT CONFERENCE is scheduled as follows:**

Date:                    Time:                    Dept.:              Div.:              Room:

Address of court *(if different from the address above)*:

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one)*:
   a. ☐   This statement is submitted by party *(name)*:
   b. ☐   This statement is submitted **jointly** by parties *(names)*:

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a.   The complaint was filed on *(date)*:
   b. ☐   The cross-complaint, if any, was filed on *(date)*:

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐   All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
   b. ☐   The following parties named in the complaint or cross-complaint
       (1) ☐   have not been served *(specify names and explain why not)*:

       (2) ☐   have been served but have not appeared and have not been dismissed *(specify names)*:

       (3) ☐   have had a default entered against them *(specify names)*:

   c. ☐   The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served)*:

4. **Description of case**
   a.   Type of case in   ☐ complaint       ☐ cross-complaint       *(describe, including causes of action)*:

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. January 1, 2007]

**CASE MANAGEMENT STATEMENT**

Page 1 of 4

Cal. Rules of Court,
rules 3.720–3.730
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

| PLAINTIFF/PETITIONER | | CM-110 |
|---|---|---|
| DEFENDANT/RESPONDENT | CASE NUMBER | |

4.  b.   Provide a brief statement of the case, including any damages. *(if personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐   *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.   **Jury or nonjury trial**
The party or parties request ☐ a jury trial ☐ a nonjury trial    *(if more than one party, provide the name of each party requesting a jury trial).*

6.   **Trial date**
a.   ☐ The trial has been set for *(date):*
b.   ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c.   Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.   **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a.   ☐ days *(specify number):*
b.   ☐ hours (short causes) *(specify):*

8.   **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a.   Attorney:
b.   Firm:
c.   Address:
d.   Telephone number:
e.   Fax number:
f.   E-mail address:
g.   Party represented:
☐ Additional representation is described in Attachment 8.

9.   **Preference**
☐ This case is entitled to preference *(specify code section):*

10.   **Alternative Dispute Resolution (ADR)**
a.   Counsel ☐ has ☐ has not    provided the ADR information package identified in rule 3.221 to the client and has reviewed ADR options with the client.
b.   ☐ All parties have agreed to a form of ADR. ADR will be completed by *(date):*
c.   ☐ The case has gone to an ADR process *(indicate status):*

| PLAINTIFF/PETITIONER: | CASE NUMBER: | CM-110 |
| DEFENDANT/RESPONDENT: | | |

10. d.  The party or parties are willing to participate in *(check all that apply)*:
- (1) ☐ Mediation
- (2) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)
- (3) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)
- (4) ☐ Binding judicial arbitration
- (5) ☐ Binding private arbitration
- (6) ☐ Neutral case evaluation
- (7) ☐ Other *(specify)*:

e. ☐ This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.

f. ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

g. ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court *(specify exemption)*:

## 11. Settlement conference
☐ The party or parties are willing to participate in an early settlement conference *(specify when)*:

## 12. Insurance
a. ☐ Insurance carrier, if any, for party filing this statement *(name)*:

b. Reservation of rights: ☐ Yes ☐ No

c. ☐ Coverage issues will significantly affect resolution of this case *(explain)*:

## 13. Jurisdiction
Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.
☐ Bankruptcy ☐ Other *(specify)*:
Status:

## 14. Related cases, consolidation, and coordination
a. ☐ There are companion, underlying, or related cases.
  (1) Name of case:
  (2) Name of court:
  (3) Case number:
  (4) Status:
  ☐ Additional cases are described in Attachment 14a.

b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party)*:

## 15. Bifurcation
☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons)*:

## 16. Other motions
☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues)*:

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

17. Discovery
    a. ☐ The party or parties have completed all discovery.
    b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

        <u>Party</u>                   <u>Description</u>                   <u>Date</u>

    c. ☐ The following discovery issues are anticipated *(specify)*:

18. Economic Litigation
    a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.
    b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case)*.

19. Other issues
    ☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify)*:

20. Meet and confer
    a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain)*:

    b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify)*:

21. Case management orders
    Previous case management orders in this case are *(check one)*: ☐ none ☐ attached as Attachment 21.

22. Total number of pages attached *(if any)*: _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

▸ _____
(TYPE OR PRINT NAME)             (SIGNATURE OF PARTY OR ATTORNEY)

▸ _____
(TYPE OR PRINT NAME)             (SIGNATURE OF PARTY OR ATTORNEY)
                   ☐ Additional signatures are attached

ORIGINAL

JS 44 (Rev. 12/07) (cand rev 1-16-08)

**CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

JOSEPH A. CALLAHAN, M.D.

**DEFENDANTS**

NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, MATTHEW A. PEMBERTON, TRICIA HOESLY, SHARON A. HYDE

**(b)** County of Residence of First Listed Plaintiff  CALIFORNIA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   WISCONSIN
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Edward L. Niland, Esq.
Niland & Niland
233 Oak Meadow Drive
Los Gatos, CA 95032

Attorneys (If Known)

John T. Burnite, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
525 Market Street, 17th Floor
San Francisco, CA 94105

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | Security Act | or Defendant) | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | ☐ 900 Appeal of Fee |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities— | ☐ 540 Mandamus & Other | **IMMIGRATION** | 26 USC 7609 | Determination |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | Under Equal Access |
| | ☐ 446 Amer. w/Disabilities— | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – | | to Justice |
| | Other | | Alien Detainee | | ☐ 950 Constitutionality of |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | State Statutes |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding   ☒ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. §1441(b) Diversity

Brief description of cause:
Contract dispute

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ 75,000 +   CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

☐ SAN FRANCISCO/OAKLAND   ☒ SAN JOSE

DATE
June 13, 2008

SIGNATURE OF ATTORNEY OF RECORD

JS 44 Reverse (Rev. 12/07)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.     (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.     Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.     Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.     Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.     Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.     Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**          Example:          U.S. Civil Statute: <u>47 USC 553</u>
                                       Brief Description: <u>Unauthorized reception of cable service</u>

**VII.     Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.     Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.