E-FILED on    2/26/10

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JOSEPH A. CALLAHAN,<br><br>  Plaintiff,<br><br>  v.<br><br>NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, MATTHEW A PEMBERTON, PATRICIA HOESLY, SHARON A. HYDE, and DOES 1 TO 50,<br><br>  Defendants. | No. C-08-02956 RMW<br><br><br>ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>**[Re Docket No. 38]** |

Defendant Northwestern Mutual Life Insurance Company ("Northwestern") moves for summary judgment that plaintiff Joseph A. Callahan is not entitled to disability benefits under his insurance policies and therefore cannot prevail on his breach of contract claim. In the alternative, Northwestern moves for partial summary judgment that plaintiff cannot prevail on his claims for promissory estoppel, breach of the covenant of good faith and fair dealing, intentional infliction of emotional distress, and punitive damages. For the reasons set forth below, the court denies the motion for summary judgment on the breach of contract claim but grants the motion for partial summary judgment on each of the remaining claims.

## I. BACKGROUND

Joseph A. Callahan ("Callahan") is an anesthesiologist. Compl. ¶ 1. In 1987, he entered into an insurance contract with Northwestern. *Id.* at ¶ 4. Under the terms of the insurance contract, Northwestern is obligated to pay Callahan partial disability benefits if Callahan were to become partially disabled. Compl. Ex. A § 1.3. Partial disability is defined in the insurance contract as follows:

> The Insured is partially disabled when: (a) he is unable to perform one or more of the principal duties of his occupation; or to spend as much time at his occupation as he did before the disability started; and (b) he has at least a 20% Loss of Earned Income.
>
> Until the Proportionate Benefit has been payable for six months, the Insured need not have a 20% Loss of Earned Income to be partially disabled if: he is unable to perform one or more principal duties which accounted for at least 20% of the time he spent at his occupation before the disability started; or he has at least a 20% loss of time spent at his occupation.

*Id.*

On July 14, 2006, Callahan suffered a cardiac episode. Compl. ¶ 5. He was diagnosed with severe coronary artery disease with a 99% blocked right coronary artery and 60% blocked left coronary artery. Decl. of Joseph A. Callahan, M.D. ("Callahan Decl.") at 2. In August 2006, he underwent angioplasty with placement of a stent for his 99% blocked right coronary artery. *Id*; Compl. ¶ 5. His 60% blocked left coronary artery has not been treated. Callahan Decl. at 2.

Prior to the cardiac episode, Callahan worked an average of 55 hours per week, and his occupation duties consisted of 60% operating room, 35% on-call duty, 3% pre- and post-operative care, and 2% hospital rounds. Decl. of Tricia Hoesly in support of Def.'s Mot. for Summ. J. ("Hoesly Decl.") Ex. D. After the cardiac episode and the angioplasty, Callahan's primary cardiologist, Dr. Jeffrey Carlson, restricted his work to "no high risk cases; no more than 6 hours/day." Hoesly Decl. Ex. E. Dr. Carlson anticipated that this work restriction would be medically necessary for 3 months, beginning August 11, 2006. *Id.*

Accordingly, Callahan negotiated with his employer to change his work schedule, such that he would work 6 to 8 hour work days, 4 to 5 days per week, eliminate all on-call duties, and avoid complicated and protracted surgeries. Compl. ¶ 9. Under his new work schedule, his occupation duties consisted of 90% operating room, 5% administrative, 3% pre- and post-operative care, and

1  2% hospital rounds.  Decl. of John T. Burnite in support of Def.'s Mot. for Summ. J. ("Burnite
2  Decl.") Ex. A at 280:9-282:6.  As a result of this reduced work schedule, Callahan's compensation
3  was reduced by 50%.  Compl. ¶ 9.

4       In August 2006, Callahan applied for partial disability benefits.  Hoesly Decl. ¶ 4.  He
5  submitted an Attending Physician Statement signed by Dr. Jeffrey Carlson, which stated that his
6  work schedule was to be restricted to "no high risk cases; no more than 6 hours/day" and that Dr.
7  Carlson anticipated these work restrictions would be medically necessary for 3 months, beginning
8  August 11, 2006.  Hoesly Decl. Ex. E.

9       Northwestern immediately began a claim investigation to determine whether Callahan was
10  eligible for partial disability benefits.  Hoesly Decl. ¶ 7.  In November 2006, Northwestern informed
11  plaintiff that it recognized work limitations for the period from July 14, 2006 to September 15, 2006.
12  Hoesly Decl. ¶ 13.  While continuing its review of his claim, Northwestern provided plaintiff with
13  partial disability benefits from October 12, 2006 to February 12, 2007 and waived premiums on his
14  policies on an accommodation basis.[1]  Hoesly Decl. Ex. O.

15       In December 2006, Callahan informed Northwestern that he had obtained a second opinion
16  from another doctor who recommended a "modified work schedule."  Hoesly Decl. ¶ 14.  Dr.
17  Kathiresan Sekar, who provided the second opinion, opined that "reducing his job stress and his
18  maintaining healthy lifestyle habits would be critical to stop the progression of his coronary disease
19  and possibly even lead to regression."  Compl. Ex. B.

20       The Northwestern agent handling plaintiff's claim referred the file for a medical opinion.
21  Hoesly Decl. ¶ 16.  Since August 2006, Callahan has not had any abnormal treadmill tests, EKGs, or
22  any stress/echo evidence of cardiac ischemia.  Burnite Decl. Ex. A at 232:15-234:7.  Dr. Joel
23  Weiner, a medical consultant, reviewed plaintiff's medical records and found no medical basis for
24  ongoing work limitations based on his coronary artery disease condition.  Hoesly Decl. Ex. L.
25  Northwestern Mutual then sent plaintiff's medical records to Dr. Dianne Zwicke, a board certified

---

[1] Under the terms of the insurance contract, Callahan becomes eligible for partial disability benefits on the 91st day of disability. Compl. Ex. A § 1.3.  Assuming that Callahan met the requirements of "partial disability," he would become eligible for benefits on October 12, 2006, the 91st day of his disability (which began on July 14, 2006).

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT—No. C-08-02956 RMW
CCL                                                            3

cardiologist, for further review. *Id.* at ¶ 17. Based on his medical records and his performance on a stress test in August 2006, Dr. Zwicke opined that Callahan did not suffer from any medical condition that would prevent him from performing his usual work duties. Decl. of Dianne L. Zwicke, M.D. in support of Def.'s Mot. for Summ. J. ("Zwicke Decl.") ¶ 3. She found no medical data supporting a reduction in work hours and work responsibilities after November 11, 2006. *Id.*

In March 2007, Callahan notified Northwestern that he had begun seeing a psychologist, Dr. Judith Stewart. Hoesly Decl. ¶ 19. Northwestern asked Dr. Micheal Logan, a board certified psychiatrist, to review Dr. Stewart's records. *Id.* at ¶ 20. Dr. Logan found no evidence supporting a psychiatric diagnosis and no indications of psychiatric work limitations. Decl. of Micheal J. Logan, M.D. in support of Def.'s Mot. for Summ. J. ("Logan Decl.") ¶ 3.

On June 27, 2007, Northwestern informed plaintiff that he was not eligible for partial disability benefits beyond November 11, 2006. Hoesly Decl. ¶ 21. Northwestern did not seek reimbursement for previous accommodation payments. *Id.* Callahan appealed Northwestern's initial claims decision and submitted additional medical information in support of his appeal. *Id.* at ¶ 22. Dr. Weiner, Dr. Zwicke, and Dr. Logan reviewed the additional information and found no medical or psychiatric basis for a work limitation. *Id.* at ¶¶ 24-26. On November 15, 2007, Northwestern informed plaintiff that its initial claim decision was upheld. *Id.* at ¶ 28.

On May 5, 2008, Callahan filed suit against Northwestern for breach of contract, promissory estoppel, breach of the covenant of good faith and fair dealing, and intentional infliction of emotional distress.

## II. ANALYSIS

### A. Breach of Contract

Northwestern contends that there is no genuine issue of material fact regarding whether Callahan is entitled to disability benefits under his insurance policies. According to Northwestern, the evidence clearly shows that Callahan is not entitled to benefits and therefore cannot prevail on his breach of contract claim. In order for Callahan to be entitled to partial disability benefits, he must: (1) be unable to perform one or more of the principal duties of his occupation or be unable to spend as much time at his occupation as he did before the disability began, and (2) have his income

reduced by 20% as a result. Compl. Ex. A § 1.3. Callahan alleges that his compensation was reduced by 50% due to the reduced work schedule he adopted after his cardiac incident and angioplasty. Compl. ¶ 9. Northwestern does not contend that his income was not reduced by 20% and thus appears to concede that the second prong of the partial disability test has been met. The dispute therefore lies in whether Callahan is either: (1) unable to perform one or more of his principal duties as an anesthesiologist or (2) unable to spend as much time working as he did before his cardiac incident. On a motion for summary judgment, the court must determine whether there is a genuine issue of material fact as to either issue.

### 1. Unable to Perform a Principal Duty

Callahan contends that he is unable to perform one of his principal pre-disability duties as an anesthesiologist – working on long, stressful, high-risk cases. According to Callahan, certain types of surgeries are long, complex, high-risk, and thus particularly stressful for an anesthesiologist. Callahan Decl. at 2. After his cardiac episode, Callahan's primary cardiologist, Dr. Carlson, restricted his work to "no high risk cases." Hoesly Decl. Ex. E. Accordingly, Callahan modified his work schedule to avoid long and stressful cases. Callahan Decl. at 2. Though Dr. Carlson's initial recommendation suggested a work limitation of only three months, Callahan has submitted evidence that Dr. Sekar, who provided a second opinion, recommended a long term reduction in job stress in order to stop the progression of his coronary disease. Compl. Ex. B. In addition, he has submitted evidence that Dr. Carlson later opined that Callahan should "limit himself to low risk patients and to procedures that can be completed in less than 4 hours" in order to reduce his risk of future cardiac and vascular incidents. Callahan Decl. Ex. B.

Northwestern argues that Callahan is clearly able to perform all of his principal duties as an anesthesiologist because he has continued to practice anesthesia to any extent since July 2006. Essentially, Northwestern claims that because every anesthesia procedure has the potential to become a "high stress" case, one cannot differentiate between "low stress" and "high stress" cases. In support of its contention, Northwestern has submitted a letter from Dr. Jeffrey L. Swisher, a board certified anesthesiologist, which states "[a]ll patients and all operations have within them the seed of anesthetic disaster." Burnite Decl. Ex. B. The court finds that there is a genuine issue of material

fact as to whether there is a meaningful way to differentiate between more stressful, high risk cases and less stressful, low risk cases. Moreover, there seems to be no dispute that one can at least differentiate between cases that take less than four hours to complete and those that take four or more hours to complete.

Northwestern also argues that Callahan is clearly able to perform all of his principal duties as an anesthesiologist because he has not advised his patients, hospitals, or licensing or certification boards of his alleged impairment. Burnite Decl. Ex. A at 42:20-43:17; 45:7-46:11, 50:17-20. According to Dr. Swisher, if Callahan truly has a partial disability, he is obligated to inform his patients of his disability, as it is a materially relevant fact that may impact his ability to care for them. Burnite Decl. Ex. B. In addition, he may be obligated to inform others of any disability, including his hospital and the state licensing board. *Id.* However, the fact that plaintiff has not advised his patients, hospitals, or the state licensing board of any impairment does not conclusively prove that he was not impaired. Callahan may still have an impairment that prevents him from working on certain types of cases, such that he would be entitled for partial disability benefits. Though his failure to report this impairment may be a violation of his ethical duties (and perhaps cause for disciplinary action by the hospital or the state licensing board), Northwestern has not shown how this would impact its contractual duty to pay Callahan partial disability benefits.

Finally, Northwestern argues that the medical restrictions placed upon Callahan are based on the possibility of a future cardiac condition rather than based on his current cardiac condition. As a preliminary matter, the court notes that drawing the line between restrictions that merely prevent possible future conditions and restrictions mandated by existing conditions is a difficult, fact-intensive inquiry. To some extent, all limitations based on a doctor's recommendation (as opposed to limitations based on physical impossibility) are forward-looking and serve the purpose of preventing future conditions. Some evidence in the record appears to support Northwestern's contention, while other evidence suggests otherwise. Dr. Sekar recommended stress reduction as "critical to *stop the progression* of his coronary disease." Compl. Ex. B (emphasis added). This language suggests that the limitation is based on Callahan's existing cardiac condition and the need to stop an existing disease from getting worse. Dr. Carlson recommended limiting Callahan's work

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT—No. C-08-02956 RMW
CCL                                                                 6

1  to low-risk patients and procedures that would take less than four hours for the purpose of "reducing
2  his risk of *future* cardiac and other vascular events." Callahan Decl. Ex. B (emphasis added). This
3  language could be read as suggesting that the restriction is based entirely on the possibility of a
4  future condition, rather than required in light of his existing condition. In light of conflicting
5  evidence, the court finds that there is a genuine issue of material fact as to whether the medical
6  restrictions recommended by Callahan's doctors are based on the possibility of a future cardiac
7  condition or mandated by his current cardiac condition.

8  The evidence submitted by Callahan tends to show that there is a genuine issue of material
9  fact as to whether Callahan's disability meets the insurance policies' requirement of being "unable to
10 perform one or more of the principal duties of his occupation." Compl. Ex. A § 1.3. However,
11 Callahan's opposition brief states that he "was, and is, fully capable of dealing with, and competently
12 handling the requirements and the stresses attendant to complicated, critical surgeries." Opp'n at 2.
13 This appears to be an admission that Callahan is fully able to work on long, stressful, high-risk
14 cases, contrary to his other arguments and evidence tending to show otherwise. Consequently, the
15 court considers whether Callahan has presented a triable issue of fact with respect to whether he is
16 able to spend as much time working as he did prior to the cardiac incident.

17            **2.     Unable to Spend as Much Time Working**

18 Callahan also contends that he is unable to spend as much time working as an
19 anesthesiologist as he did before his disability. Prior to his cardiac episode, he worked an average of
20 55 hours per week. Hoesly Decl. Ex. D. After the cardiac episode, Dr. Carlson recommended that
21 he work "no more than 6 hours/day." Hoesly Decl. Ex. E. Accordingly, Callahan reduced his work
22 schedule to 6 to 8 hour work days, 4 to 5 days a week. Compl. ¶ 9. Though Dr. Carlson initially
23 anticipated that such a work limitation would only be necessary for three months, he later opined
24 that Callahan should continue to "limit his work time to 6 hours or less per day" and stop working
25 nights and weekends in order to reduce his risk for future cardiac and vascular incidents. Callahan
26 Decl. Ex. B.

27 Northwestern suggests that CPT codes submitted by plaintiff show that he was able to spend
28 as much time working post-disability as he did pre-disability. Northwestern points to the fact that

1  Callahan worked an average of 16 cases per week from January to June of 2006 (pre-disability) and
2  then worked an average of 13 cases per week from August to October of 2006 (post-disability).
3  Hoesly Decl. ¶ 12.  Northwestern seems to argue that this reduction to 81% of pre-disability
4  production is insufficient to meet the insurance policy's partial disability requirement.

5        First, the language in the insurance contracts requires only *some* reduction in the amount of
6  time the insured is able to spend at his occupation (not a minimum 20% reduction) when there is at
7  least a 20% loss of earned income.  Compl. Ex. A § 1.3.  Only when there has not been at least a
8  20% loss of earned income would an insured need to show that he has at least a 20% loss in the
9  amount of time spent at his occupation.  *Id.*  Since Northwestern does not appear to dispute
10 Callahan's claim that his compensation has been reduced by 50%, the amount of Callahan's loss of
11 time spent working is irrelevant so long as there is *some* loss of time.

12       Second, the insurance policies require that the insured is not able "to spend as much time at
13 his occupation as he did before the disability started."  Compl. Ex. A § 1.3.  Thus, the relevant
14 question is the amount of time spent working, not the number of cases worked pre- and post-
15 disability.  Though the number of cases worked and other production measures may be useful
16 proxies in determining how much time Callahan spent working post-disability, all of these measures
17 show a reduction in time spent working.  *See, e.g.,* Hoesly Decl. ¶ 12 (reduction from an average of
18 16 cases per week to 13 cases per week); Hoesly Decl. Ex. L (Daryl Lepak's report to Northwestern
19 stating, "When compared to the pre-disability codes, the Insured appears to be performing a reduced
20 amount of production.").  Callahan has also testified that based on doctors' recommendations, he has
21 reduced his work schedule from a "full unrestricted schedule" to working only "approximately one-
22 third the monthly hours worked by [his] peers."  Callahan Decl. at 2.  Thus, the evidence on the
23 record clearly establishes that Callahan did not spend as much time at his occupation post-disability
24 as he did before the disability started.[2]

---

27 [2] Moreover, even if Northwestern does dispute the amount by which Callahan's earned income has
been reduced, there is at least a triable issue of fact as to whether Callahan has had to reduce the
28 amount of time he spends at this occupation by at least 20%.

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT—No. C-08-02956 RMW
CCL                                                                 8

1    The question remains whether the time restrictions were based on the possibility of a future cardiac condition rather than based on his current cardiac condition, as Northwestern contends.  For the same reasons discussed above, the court finds that there is a genuine issue of material fact as to whether the medical restrictions recommended by Callahan's doctors meet the insurance policies' requirement of being "unable to spend  as much time at his occupation as he did before the disability started."  Compl. Ex. A § 1.3.  Therefore, the court denies Northwestern's motion for summary judgment that Callahan is not entitled to disability benefits under his insurance policies.

**B.     Promissory Estoppel**

"The elements of a promissory-estoppel claim are: (i) a clear promise; (ii) that the promisor should reasonably expect to induce action or forbearance; (iii) upon which the promisee reasonably relies."  *Oracle Corp. v. Falotti*, 187 F. Supp. 2d 1184, 1206 (N.D. Cal. 2001) (citing *Lange v. TIG Ins. Co.*, 68 Cal. App. 4th 1179, 1185)(1999)).  Callahan alleges that Matthew A. Pemberton, a sales representative for Northwestern, represented to him that "because of his high income and the nature of his high stress practice, that it was important for him to purchase multiple policies, indexed for inflation and specifically covering 'partial disability' in the event that he needed to reduce his stress levels for health reasons."  Compl. at 4.  Plaintiff claims that he relied on this representation and thus seeks to estop Northwestern from denying partial disability coverage.  *Id.* at 4-5.

Northwestern seeks partial summary judgment on this promissory estoppel claim, in part because plaintiff admits that Pemberton did not make any representations regarding how Northwestern would determine whether he was "unable to perform one or more of the principal duties of his occupation; or to spend as much time at his occupation as he did before the disability started" as required to qualify for partial disability benefits.  Burnite Decl. Ex. A at 257:16-23; Compl. Ex. A § 1.3.  As described by plaintiff, it appears that Pemberton merely stressed the importance of purchasing partial disability coverage.  It is undisputed that Pemberton did not make a clear promise regarding how partial disability determinations would be made by Northwestern in accordance with the insurance policies.  Callahan appears to concede this point, as he did not oppose partial summary judgment on this issue.  The court finds that there is no genuine issue of material

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT—No. C-08-02956 RMW
CCL                                             9

1 fact on this issue and that Northwestern is entitled to judgment as a matter of law with respect to
2 plaintiff's promissory estoppel claim.

### C. Breach of the Covenant of Good Faith and Fair Dealing

In California, every insurance contract contains an implied covenant of good faith and fair dealing. *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 720 (2007). An insurer breaches this covenant by denying benefits to which the insured is entitled only if the denial was unreasonable. *Id.* at 723. In other words, when there is a "genuine dispute" as to whether the insured is entitled to benefits, the insurer is not liable for breaching the covenant of good faith and fair dealing (even if its denial was erroneous, making it liable for breach of contract). *Id.* "A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds." *Id.*

Northwestern contends that there was a "genuine dispute" over Callahan's entitlement to partial disability benefits and thus seeks partial summary judgment on plaintiff's bad faith claim. Summary judgment in favor of the insurer is proper when "it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable . . . On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably." *Id.* at 724 (citing *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1162 (9th Cir. 20020)).

Callahan argues that the denial of benefits was unreasonable because it was based solely upon a review of his medical records and did not involve an independent medical examination. Denying a claim without fully investigating the grounds for denial is unreasonable, as is basing a denial on unfounded conclusions. *Wilson*, 42 Cal. 4th at 720-21. However, an insurance company is not always obligated to engage in an independent medical examination before denying benefits. In some cases, reviewing the insured's submitted medical records without an independent medical examination can provide an indisputably reasonable basis to deny a claim. *Id.* at 723.

In this case, there is no factual dispute regarding how Northwestern handled Callahan's claim and made its determination that he was not entitled to benefits. Northwestern sought medical opinions from both in-house and outside doctors, including Dr. Weiner, a medical consultant, Dr. Zwicke, a board certified cardiologist, and Dr. Logan, a board certified psychiatrist, regarding

Callahan's claim. Hoesly Decl. ¶¶ 16-20. These doctors reviewed plaintiff's medical records and concluded that there was no medical or psychiatric basis for a continuing work restriction. *Id.* Their findings were based in part on Callahan's "successful angioplasty, normal ejection fraction, and stress test demonstrating a good exercise tolerance with an absence of chest pain and ischemia." *Id.* at Ex. O. Northwestern relied upon these medical opinions in determining that Callahan did not qualify for partial disability benefits after November 11, 2006. *Id.*

Based on the evidence in the record,[3] no reasonable jury could find that there was no genuine dispute over Callahan's entitlement to disability benefits. *See, e.g., Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 995-96 (9th Cir. 2001) (upholding summary judgment on bad faith claim where the insurer disputed the claim based on independent expert opinions). Therefore, the court grants Northwestern partial summary judgment on the claim for breach of the covenant of good faith and fair dealing.

**D.     Intentional Infliction of Emotional Distress**

To prevail on a claim for intentional infliction of emotional distress, Callahan must establish: (1) extreme and outrageous conduct by Northwestern with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) that he suffered severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by Northwestern's outrageous conduct." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1001 (1993). To qualify as "outrageous," the conduct must be "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.* To constitute "severe emotional distress," the emotional distress must be "of such substantial quality or enduring quality that no reasonable person in civilized society should be expected to endure it." *Id.* at 1004.

No reasonable jury could find Northwestern's conduct in handling Callahan's claim to be extreme and outrageous. Moreover, Callahan has failed to present any evidence that he has suffered severe or

---

[3] Though plaintiff suggests in his opposition brief that Dr. Zwicke's medical opinion is untrustworthy, he has presented no admissible evidence supporting this contention. On a motion for summary judgment, the adverse party may not rest upon mere allegations but must set forth specific facts supported by admissible evidence showing there is a genuine issue for trial. *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995).

1 extreme emotional distress. Accordingly, the court grants Northwestern partial summary judgment on the claim for intentional infliction of emotional distress.

### E. Punitive Damages

To recover punitive damages, plaintiff must prove by clear and convincing evidence that Northwestern is guilty of oppression, fraud, or malice. Cal. Civ. Code § 3294. "Punitive damages should not be allowable upon evidence that is merely consistent with the hypothesis of malice, fraud, gross negligence or oppressiveness. Rather some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing." *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1288 n.14 (1994) (quoting *Travelers Indem. Co. v. Armstrong*, 442 N.E. 2d 349, 362 (Ind. 1982)). Even where an insurer's claim handling is "shoddy . . . witless and infected with symptoms of bureaucratic inertia and inefficiency," unless there is a "consistent and unremedied pattern of egregious insurer practices [that] might rise to the level of a malicious disregard of the insured's rights, [a court] cannot find liability [] for punitive damages based merely upon the insurer's inept and negligent handling of a claim." *Patrick v. Maryland Casualty Co.*, 217 Cal. App. 3d 1566, 1576 (1990).

Even assuming that Northwestern improperly denied disability benefits that Callahan was entitled to receive, no reasonable jury could find that Callahan has met his burden of proving by clear and convincing evidence that Northwestern acted with malice, fraud, or oppressiveness. Since Callahan has presented no evidence as to Northwestern's handling of other claims, there is no genuine issue of material fact regarding whether Northwestern's handling of his particular claim was part of a course of conduct. As in *Tomaselli*, "[t]his is not a case, therefore, in which punitive damages are warranted to punish for the maintenance of evil policies which damage the public in general." 25 Cal. App. 4th at 1288. Plaintiff has also failed to offer any evidence that is inconsistent with the hypothesis that any tortious conduct that may have occurred was merely "the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing." *Id.* at 1288 n.14. Indeed, plaintiff appears to concede this point, as he has not opposed Northwestern's motion for partial summary judgment on this issue. The court finds that there is no genuine issue of material fact

United States District Court
For the Northern District of California

with respect to plaintiff's claim for punitive damages, and Northwestern is entitled to judgment as a matter of law.

### III.  ORDER

For the foregoing reasons, the court:

1. denies Northwestern's motion for summary judgment that Callahan is not entitled to disability benefits under his insurance policies; and

2. grants Northwestern's motion for partial summary judgment on the claims for promissory estoppel, breach of the covenant of good faith and fair dealing, intentional infliction of emotional distress, and punitive damages.

DATED:   2/26/10

*Ronald M Whyte*
RONALD M. WHYTE
United States District Judge

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff:**

Edward Leo Niland          nilandlaw@gmail.com

**Counsel for Defendants:**

| | |
|---|---|
| John T. Burnite | john.burnite@wilsonelser.com |
| Thomas M. Herlihy | thomas.herlihy@wilsonelser.com |
| Sheena V. Jain | sheena.jain@wilsonelser.com |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**     2/26/10                          CCL
                                                                **Chambers of Judge Whyte**

**United States District Court**
For the Northern District of California